IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CECELIA GIBBS,                    )

     Plaintiff,                  )

VS.                              )  CASE NO. 1:05-CV-912-T

P&C GROCERS, INC., and           )

CHARLES PARKER,                  )

individually, and as an          )

agent for P&C GROCERS,           )

INC.,                            )

     Defendants.                 )


      The deposition of CECELIA GIBBS, taken pursuant to Federal Rules of Civil Procedure before Lisa M. Bryan, Court Reporter and Notary Public, State at Large, at the Law Offices of Charles W. Blakeney, 201 North Commerce Street, Geneva, Alabama, on the 20th day of February, 2006, at approximately 10:00 a.m., pursuant to notice.

EXHIBIT

A

1    Q.    And beyond that, you don't know whether

2    he had a corporation or anything like that?

3    A.    Well, I'm sure it was incorporated.    It

4    was called GOCO.

5    Q.    GOCO?

6    A.    Uh-huh.

7    Q.    All right.

8    A.    And that changed to Liberty.

9    Q.    All right.  Now, how long had you been

10    working for Mr. Carroll or for his company in any

11    of his convenience stores?

12    A.    Off and on for the last four years.

13    Q.    Did you start off as a manager or did

14    you start off as something else?

15    A.    A clerk.

16    Q.    What store did you start at?

17    A.    The one here in Eunola.

18    Q.    Is that the one on Highway 52?

19    A.    Yes.

20    Q.    All right.  And what shift were you

21    working when you first started?

22    A.    I worked both first and second.

23    Q.    And how were the shifts broken up when

1    manager in July of 2000, who was your district

2    manager?

3         A.    Trotman Carroll.

4         Q.    So when Mr. Sam Carroll lost the stores

5    for a while and Emerald Express took over, did

6    Trotman Carroll remain your district manager for

7    some period of time?

8         A.    No.

9         Q.    Who was the assistant manager when

10   Emerald Express took over?

11        A.    My assistant manager?

12        Q.    I'm sorry.  Your district manager?

13        A.    My district manager.  That's when they

14   moved Cindy up to district manager.

15        Q.    Okay.  All right.  All right.

16        A.    Cindy, and there was somebody else.  I

17   can't remember her name.

18        Q.    Okay.  All right.  You mentioned some

19   names.  As best you can, tell me the progression.

20   You said GOCO and then Liberty and then, what,

21   Emerald Express?  Is that next?

22        A.    When I first started, we were Beeline.

23        Q.    Beeline.

1    A.    And then we went to GOCO.  And then we

2    went to Emerald Express.  I am not sure if we

3    were Happy Stores during that period of time or

4    not.

5    Q.    Okay.

6    A.    And -- I don't know.  We had so many

7    different names, I'd have to look it up.

8    Q.    That's fine.  Just you're kind of going

9    on memory.  You haven't said Liberty yet.

10    A.    Liberty came and we went -- after

11    Jesseco, then we got Liberty.  And it was still

12    GOCO, but Liberty.

13    Q.    I'm not understanding what you're

14    saying, it was still GOCO, but Liberty.

15    A.    Yes, because that's when they changed

16    the signs and put Liberty signs up and -- I mean,

17    it was the same owner at that point.

18    Q.    That was Mr. Carroll?

19    A.    Yes.

20    Q.    All right.  And so when you started, it

21    was GOCO?

22    A.    No.

23    Q.    Was it Beeline?

1    A.    Yes.

2    Q.    So you go all the way back to when the

3 store was under Beeline's name?

4    A.    Uh-huh.

5    Q.    All right.  And who owned Beeline?

6    A.    That, I couldn't tell you.

7    Q.    All right.  Who was your -- who did you

8 report to?

9    A.    I reported to my manager --

10    Q.    Manager?

11    A.    -- at that point.

12    Q.    And beyond that you didn't know --

13    A.    No.

14    Q.    -- who was above the manager?

15    A.    No.

16    Q.    And that was Kim Woods?

17    A.    Yes.

18    Q.    All right.  I am kind of getting lost in

19 these names, now.  But when GOCO took over

20 Beeline, Kim Woods was still the manager of the

21 store?

22    A.    Right.

23    Q.    Now, when GOCO -- and that's Mr. Sam

1    Carroll; is that correct?

2        A.    Yes.

3        Q.    When GOCO took over the store from

4    Beeline, Kim Woods was the manager.  Do you know

5    who her district manager was?

6        A.    When GOCO took them over?  It would have

7    been Trotman.

8        Q.    Trotman Carroll.  Okay.  All right.  So

9    then when Emerald Express took over, as I'm

10   understanding what you're saying, you were the

11   manager and Cindy Woolover was your district

12   manager?

13       A.    Right.

14       Q.    There was some period of time in here --

15   you may not have the chronology right, but there

16   was some period of time in here where there was a

17   -- it was called Happy Stores?

18       A.    Yes.  There were some time -- I -- we

19   went through so many names at that store.

20       Q.    All right.  And when it was Happy

21   Stores, were you the manager?

22       A.    No.

23       Q.    Who was the manager then?

1    A.    Kim Woods.

2    Q.    And she was still the manager?

3    A.    It might have been Tina.

4    Q.    Tina who?

5    A.    I don't know Tina's last name.

6    Q.    And at that time, you were a clerk of

7  the store?

8    A.    Right.

9    Q.    Working under either one of those two

10 ladies, Kim Woods or Tina?

11   A.    Right.

12   Q.    And now you said Jesseco?

13   A.    They leased the store.

14   Q.    Do you know -- let me start it this way.

15 When it was under the name of Jesseco, were you a

16 store manager?

17   A.    Yes.

18   Q.    All right.  Who was your district

19 manager?

20   A.    Cindy.

21   Q.    Woolover?

22   A.    Uh-huh.  Yes.

23   Q.    Do you know who was the next level above

1    her; do you know?

2         A.    I don't know that lady's name anymore.

3         Q.    There was a lady she reported to?

4         A.    Yes.

5         Q.    Do you know who owned Jesseco, or who

6    the primary principal was?

7         A.    Not exactly.  Somebody in New York, I

8    guess.

9         Q.    Okay.

10        A.    They didn't have us very long.

11        Q.    Do you think they were leasing from Mr.

12   Carroll?

13        A.    They were.

14        Q.    And then after Jesseco was Liberty?

15        A.    We went back to -- well, actually we

16   went to GOCO, but they called it Liberty.

17        Q.    Okay.  And you were the store manager

18   then?

19        A.    Yes.

20        Q.    And who was your assistant -- I mean --

21   I keep saying assistant -- district manager?

22        A.    Cindy and Ken Howard.

23        Q.    And do you know who the next level was

1  above them they reported to?

2      A.   Sam Carroll.

3      Q.   All right.  And then is the next

4  ownership, the P&C Grocers after Liberty?

5      A.   Yes.

6      Q.   All right.  How were you made aware of

7  the change in the ownership from GOCO Liberty to

8  P&C Grocers?

9      A.   They just come in and cash audit you, do

10  an inventory on the store, and say we are the new

11  owners.

12      Q.   When you say they, who are you talking

13  about?

14      A.   Mr. Parker and his inventory crew.

15      Q.   So did you have any previous notice,

16  any, you know, talk in the wind, so to speak,

17  that there was something in the air that maybe

18  Sam Carroll was going to be selling or leasing

19  the store?

20      A.   Yes.

21      Q.   There was some talk about it?

22      A.   Yes.  We all knew that it was happening.

23      Q.   All right.  When is it that you

1    remember, roughly month, year that you remember

2    that P&C Grocers took over the store operation

3    from GOCO Liberty?

4        A.    I believe it was January 5th, 2004.

5        Q.    Okay.

6        A.    I believe somewhere right in there.

7        Q.    Okay.  And at that time, you were the

8    store manager?

9        A.    Yes.

10       Q.    And you remained the store manager up

11   until the time you were terminated?

12       A.    Yes.

13       Q.    And your district manager when P&C

14   Grocers took over was who?

15       A.    Charles Parker.

16       Q.    So he acted as the district manager?

17       A.    Yes.  Cindy sometimes, but not much.

18       Q.    Woolover?

19       A.    Yes.

20       Q.    Okay.  Well, tell me how that worked

21   when you say sometimes she was the district

22   manager, but not much.

23       A.    In the beginning, she came to the

1    A.    Right.

2    Q.    -- so the weather was warm, I guess?

3    A.    Yes.

4    Q.    So it was either spring or summer?

5    A.    It was just -- probably about a month

6    before Mr. Parker let me go.

7    Q.    And when was it that you were

8    terminated?

9    A.    I believe it was in June 2004.

10    Q.    All right.  So you worked approximately

11    six months --

12    A.    Right.

13    Q.    -- under P&C Grocers, Incorporated; is

14    that correct?

15    A.    Right.

16    Q.    Now, when you were working before that,

17    back in '03 with GOCO Liberty, how -- do you --

18    how were -- who was actually your employer?  And

19    what I mean by that is the name of the company on

20    your paycheck.

21    A.    Skilstaff.

22    Q.    Skilstaff.  How about under Jesseco?

23    A.    Skilstaff.

35

1    Q.    That's the one you worked?

2    A.    Uh-huh.

3    Q.    What I am asking is, when P&C Grocers

4  took over, was there ever a time when Mr. Parker

5  came and had a group meeting of all of the

6  employees working in that store, you, the

7  assistant manager and the clerks?

8    A.    Mr. Parker had one meeting with me and a

9  couple of other people, because one of my guys on

10  the weekend shift came up $60.00 short.

11   Q.    All right.  So approximately how long

12  after P&C had taken over in January of '04 was

13  this meeting?

14   A.    I couldn't tell you, because it wasn't

15  really a meeting.  It was just -- I mean, he

16  wanted some of the employees there and we were

17  there.

18   Q.    And so it was really kind of -- what I'm

19  hearing, and you correct me if I am wrong, what

20  I'm hearing is the meeting was really more in

21  reaction to somebody being $60.00 short?

22   A.    Yes.

23   Q.    And Mr. Parker addressing that?

1     A.   No.

2     Q.   To your knowledge, when GOCO Liberty was

3 operating the stores, did clerks or assistant

4 managers receive any training on discrimination

5 or sexual harassment?

6     A.   No.

7     Q.   When you became store manager with GOCO

8 Liberty -- when Mr. Carroll was owner and

9 operating those stores, did you receive any

10 training on discrimination or sexual harassment?

11     A.   No, not that I know of.

12     Q.   Now, were there any signs, posters,

13 anything like that located anywhere in the store

14 that dealt with sexual harassment or

15 discrimination?

16     A.   I believe there was a poster hanging up

17 at the store.

18     Q.   Was that there when GOCO Liberty owned

19 and operated it?

20     A.   It was there the whole time I was there.

21     Q.   All right.  And where is it located?

22     A.   If I'm not mistaken, it is on the far

23 wall.  It used to be over by the door and they

1    A.    No.

2    Q.    And you never did it in response to any

3    situation at the stores about sexual harassment

4    or discrimination?

5    A.    No.  We really didn't have -- we didn't

6    have a book or a manual.  I mean, that was there.

7    I mean, but it was just there.

8    Q.    All right.  Now, when Mr. -- and you may

9    have already answered this.  I'm not meaning to

10   be repetitive if you think that this is

11   repetitive.  But when Mr. Carroll owned and

12   operated the GOCO Liberty stores --

13   A.    Uh-huh.

14   Q.    -- did he ever have any kind of group

15   meeting or one on one meeting with you to go over

16   his policy and procedure regarding sexual

17   harassment or discrimination?

18   A.    Not that I remember.

19   Q.    All right.  You already told me that Mr.

20   Parker would come to the store once or twice a

21   week acting as the district manager to check on

22   things at the store.  You've also told me about

23   one group meeting at the state park in Florala.

1    months that you were employed by P&C Grocers, did

2    anybody you perceived to be in management like

3    Mr. Parker was with P&C Grocers, ever come to the

4.   store besides Mr. Parker?  Anybody else in

5    management come to the store?

6        A.    Cindy and Trotman.

7        Q.    And they were the district managers?

8        A.    Yes.   Well, I don't know what Trotman

9    actually was.

10       Q.    Okay.

11       A.    Cindy and Trotman.  I can't think of

12   anybody else being there, but that doesn't mean

13   they weren't.

14       Q.    Now, we said two different Cindys,

15   Garrett and Woolover.  And so when you said

16   Cindy, you mean Woolover?

17       A.    It would be Woolover, yes.

18       Q.    I am not suggesting that there were, I'm

19   just trying to find out.

20       A.    Todd came once.

21       Q.    Todd Parker?

22       A.    Mr. Parker's son.  To drop off payroll.

23   I can't think of anybody else, but that doesn't

mean there wasn't.

Q.    All right.  Okay.  At the group meeting

at the state park in Florala, were there managers

other than yourself present at that meeting?

A.    Yes.

Q.    And there were district managers there,

as well?

A.    Yes.

Q.    Mr. Parker was there?

A.    Yes.

Q.    And Todd Parker was there?

A.    Yes, I believe so.

Q.    Were there any other owners of P&C

Grocers present at that meeting?

A.    Trotman Carroll.

Q.    Okay.  Now, I'm -- I guess I should just

ask for the record.  Trotman Carroll and Sam

Carroll, they're related?

A.    Yes.

Q.    They're brothers?

A.    Yes.

Q.    Did Trotman Carroll have some kind of

ownership interest in GOCO Liberty when Sam

1    anything for the meeting?

2        A.    I don't remember.  I don't think so.

3        Q.    Okay.  All right.  And the meeting

4    lasted most of a day?

5        A.    Pretty much, yes.

6        Q.    Or the daylight hours of the day?

7        A.    Yes.

8        Q.    And so besides the social time of

9    cooking out and eating, there was also a business

10   purpose to the meeting?

11       A.    Yes.

12       Q.    And you've already told me you don't

13   remember when that was?

14       A.    The meeting date, no, I don't remember.

15       Q.    I think you said it was about a month

16   before you were terminated?

17       A.    Somewhere right in there.

18       Q.    And were things like inventory control,

19   purchasing, that kind of thing discussed?

20       A.    Yes.

21       Q.    Were there some stores that P&C Grocers

22   owned and operated that were in wet counties that

23   could sell beer and that kind of thing?

1   from that point up until this meeting at Florala?

2       A.   I believe so.

3       Q.   And then at the meeting in Florala, all

4   of the managers, including you, were given a

5   policy book?

6       A.   Yes.

7       Q.   And that then was to stay on the

8   premises of the store?

9       A.   Right.

10      Q.   And that went under the counter?

11      A.   No.   That was sitting on my desk.

12      Q.   Sitting on your desk.   Now -- so was

13  part of the meeting at the state park to go

14  through that policy manual?

15      A.   Yes.

16      Q.   And who did that?

17      A.   I am not sure.   I don't remember.

18      Q.   All right.   But at the conclusion of

19  that, all of the managers were told that that

20  policy manual should be on the premises of the

21  store?

22      A.   Right.

23      Q.   Was anything said about going over that

1  policy manual with assistant managers?

2      A.   We went through them with all employees.

3      Q.   Were the assistant managers at this

4  meeting in Florala?

5      A.   No.

6      Q.   So when you came back to the store, you

7  went through the policy manual with your -- all

8  of your employees?

9      A.   Yes.

10      Q.   Did you do that one on one or in a group

11  setting?

12      A.   No.  We had a group meeting.  Everybody

13  needed to read the book.

14      Q.   So even though you had people working

15  nighttime second shift, you got them all together

16  at one time?

17      A.   Right.

18      Q.   And you explained to them that you had

19  gone to a manager's meeting in Florala?

20      A.   Yes.

21      Q.   And that you had been given this policy

22  manual?

23      A.   Yes.

1    Q.    And you went over that policy manual

2    with all of the employees?

3    A.    Right.

4    Q.    Do you remember -- in the policy manual,

5    do you remember there being anything in writing

6    addressing discrimination or sexual harassment?

7    A.    Yes, there was, but I don't remember

8    what.

9    Q.    But whatever it was, somebody at the

10   state park in Florala went over whatever that was

11   with the managers, and then you went over

12   whatever that was with your employees?

13   A.    They read through it.  I mean, they

14   didn't read all of it, but they just, you know,

15   kind of read through certain sections and went to

16   the next.

17   Q.    And is that similar to what you did with

18   your employees?

19   A.    Yes.

20   Q.    Just to make them aware that the company

21   did have a policy?

22   A.    And everybody was supposed to read the

23   book.

 1     Q.    Okay.

 2     A.    I mean, that's what we were told to tell

 3  them.

 4     Q.    Now, were they just supposed to read it

 5  there on the store premises, or were they

 6  provided a copy of it to read at their leisure or

 7  whatever?

 8     A.    No.  On the store premises when they

 9  were working.

10     Q.    Were they then required to sign

11  something indicating they had read it?

12     A.    They were supposed to, yes.

13     Q.    Was that just voluntary?

14     A.    No.

15     Q.    I mean, was it up -- when I say

16  voluntary, was it up to them whether or not they

17  signed that they had read the manual?

18     A.    No.  They wanted everybody to sign it.

19     Q.    And was there some kind of deadline that

20  was given --

21     A.    No.

22     Q.    -- that you're supposed to read it by

23  such and such a date?

1    you or rub your shoulders?

2        A.    Yes.

3        Q.    And that started from the first time Mr.

4    Parker came to the store?

5        A.    The first time Mr. Parker ever came into

6    the store.

7        Q.    All right.  So when he came in with his,

8    I think you called it inventory team, to take

9    inventory and introduce himself as the new owner,

10   on that occasion, is it your testimony that Mr.

11   Parker touched you inappropriately?

12       A.    I don't know.  I can't say that because

13   I'm not for sure, because I don't remember -- we

14   had so much going on at that point.

15       Q.    So you're not sure about that, but then

16   from that point, whenever he would come by

17   himself to check on the store, acting as district

18   manager, you're saying every time he would touch

19   you inappropriately?

20       A.    And he would be rubbing on your

21   shoulders.

22       Q.    Explain that to me when you say he

23   rubbed on your shoulders.

1    sexually suggestive way.  What are you talking

2    about?

3        A.    Mr. Parker was asked not to put his

4    hands on me, but Mr. Parker continued it anyway.

5        Q.    Well, that's a different answer than

6    what I'm asking you right now.  It says, Rubbed

7    the plaintiff's shoulders in a sexually

8    suggestive way.  What are you talking about when

9    you say a sexually suggestive way?

10       A.    I don't like anybody touching me, and I

11   don't think rubbing a person's shoulders and

12   going down into their neck area is -- I don't

13   think it's appropriate.  I'm just sorry.

14       Q.    All right.

15       A.    It's not appropriate.

16       Q.    All right.  And you are saying that

17   without exception over time that Mr. Parker came

18   to the store alone, and you were there, that he

19   would do this?

20       A.    When I was alone?

21       Q.    No.  When he came to the store alone and

22   you were there, he would do this?

23       A.    Yes.  Mr. Parker always came in

1    Q.    All right.   Did Mr. Parker ever touch

2    you in any other way than what you've already

3    described?

4    A.    One time he grabbed me and sat me down

5    on the milk crate.

6    Q.    Tell me about that.

7    A.    Let me see.   One of my employees -- that

8    was Donnie -- misplaced -- actually he misplaced

9    it, but he wrote up this crazy over ring thing,

10   but he was not short and he made up the over ring

11   thing.   And Mr. Parker sat me down on the chair

12   and says, What's going on here, pointing his

13   finger at me.   And I go to say something, he'd

14   tell me to shut up and to listen to him.

15   Q.    Now, when you say that he sat you down

16   on the chair, tell me more of what you're talking

17   about.

18   A.    I mean he got me by my arms and sat me

19   down.

20   Q.    And this would have been -- he would

21   have come around the counter --

22   A.    Yes.

23   Q.    -- to the area where the register was --

1    A.    Right.

2    Q.    Well, did you take that as a sexual

3    overture when he took you by your arms and sat

4    you on the milk crate, or was that in connection

5    with this over ring situation with Donnie?

6    A.    Well, he was basically either accusing

7    me or Donnie of stealing, and that's all there

8    was to it.  And no, he would just be very

9    aggressive --

10    Q.    All right.

11    A.    -- and mean.

12    Q.    All right.  Is there any other way

13    besides what you have already told me about that

14    Mr. Parker touched you?

15    A.    No.

16    Q.    All right.  Now, you made a statement in

17    response to another question I asked you that is

18    not really the answer to my question.  You said

19    that Mr. Parker was told to leave you alone and

20    he didn't.  Tell me about that.

21    A.    Mr. Parker started rubbing my shoulders.

22    I said, Mr. Parker, don't be touching me, I don't

23    like it.  It wasn't very much longer I ended up

1

2                    (A short break was taken.)

3

4    BY MR. JACKSON:

5        Q.    We have taken a break here.  And we were

6    talking about Mr. Parker touching you in an

7    inappropriate way that you felt was

8    inappropriate, and you telling him not to do so.

9    Before you got real ugly and you would tell Mr.

10   Parker leave me alone or don't touch me, did I

11   understand that correctly that's what you would

12   say, but not in an ugly tone?

13       A.    I'd just tell him to quit, and walk

14   away.

15       Q.    Quit and walk away.  How would he

16   respond or react to that?

17       A.    Get back over here, Cissy, I'm not done

18   talking to you.

19       Q.    All right.  And then would you go back

20   over to him for him to talk to you more?

21       A.    Yes.

22       Q.    Would he start touching you again?

23       A.    No.

Q. All right. Now, the time that you said that you got real ugly, on that occasion you said, Don't be touching me, I don't like it, how did Mr. Parker react to that?

A. He didn't react.

Q. Did he continue doing it?

A. I walked away again. Either I walked away or he walked away. One of the two of us did.

Q. All right.

A. I'm not sure.

Q. And did that -- when you walked away, did that end it on that occasion?

A. Yes.

Q. All right. Did he say anything before he left the store on the day of that occasion in an ugly tone, you told him, Don't be touching me, I don't like it?

A. Did he say anything to me about it?

Q. Yes.

A. No.

Q. About the incident or anything like that?

1      A.    No.

2      Q.    All right.  And then after that occasion

3   when you say you got real ugly and told him that,

4   the next time he came to the store, what, if

5   anything, happened?

6      A.    I don't believe anything did.

7      Q.    How about the next trip?

8      A.    There wasn't too many more trips before

9   I wasn't there.

10     Q.    Okay.  From the time -- whatever the

11  occasion was that you got, as you put it, real

12  ugly, and told him, Don't be touching me, I don't

13  like it, and y'all separated, from that point,

14  was there any other occasion or time when Mr.

15  Parker touched you inappropriately?

16     A.    Not that I can remember right offhand.

17     Q.    Okay.  And then shortly thereafter, I

18  think you said within a few weeks, you were

19  terminated?

20     A.    Right.

21     Q.    Did Mr. Parker terminate you?

22     A.    Yes.

23     Q.    Was it done in person or by telephone?

A.    Telephone.

Q.    And were you at the store or at the house?

A.    I was at my home.

Q.    Do you know where he was?

A.    He was at my store.

Q.    Do you know what time of the day it was?

A.    If I'm not mistaken, it was right around 1:00 or 2:00.  I'm not sure.

Q.    And for what reason were you not in the store that day?

A.    I already knew I was being fired.  I had found out beforehand.  And I went into the store that morning and I called Mr. Parker and told him I had went home.

Q.    Okay.  And how did you find out ahead of time that you were going to be fired?

A.    The manager that he hired to take my place had told several people in Geneva, and it came right back to me.  And I called Mr. Parker the night before and asked him.

Q.    And the person he hired to replace you is named who?

1    A.    It was very short.

2    Q.    Okay.  So you went on into work the next

3  day?

4    A.    Yes.

5    Q.    But then you left the store?

6    A.    Yes.

7    Q.    And you left the store before Mr. Parker

8  got there?

9    A.    I left that morning.

10    Q.    Was Wanda Short there?

11    A.    No.

12    Q.    So who was left to run the store?

13    A.    I called Cindy in.

14    Q.    Cindy --

15    A.    Garrett.

16    Q.    How long were you at work before you

17  called Cindy in?

18    A.    It wasn't very long.  Approximately

19  maybe a half-an-hour, 45 minutes.  But there was

20  no sense in me staying at the store when I'm up

21  there crying.

22    Q.    Okay.  And you went on to the house

23  after Cindy came in to relieve you?

1    A.   Right.

2    Q.   All right.  And then your understanding

3  is that Mr. Parker then called you, you were at

4  your house and he was at the store?

5    A.   Right.  Mr. Parker was at the store.

6    Q.   And tell me about that conversation.

7    A.   He basically told me that I needed to

8  get my life right with God.  I needed to quit

9  drinking.  And when I did those things, to call

10  him back and he may put me back to work, but for

11  now he was letting me go.

12    Q.   All right.  Now, before I move on to

13  religion, I want to make sure I give you an

14  opportunity to tell me -- and you may have --

15  everything about the sexual harassment in the way

16  of touching you.  Have you told me everything

17  about that?

18    A.   Pretty much of what I can remember.

19    Q.   Now, you've also got in the complaint

20  harassing remarks.  That would be obviously

21  words, comments that Mr. Parker subjected you to,

22  unwanted, inappropriate harassing remarks.  What

23  do you mean by that?

1     A.   When he made me fire Jason, he told me

2  that you don't get your pussy where you get your

3  paycheck.  Those were his exact words.  And I

4  ain't ever heard anybody put it so bluntly and

5  nasty.

6     Q.   Now, the Jason you're talking about was

7  Jason --

8     A.   Crosby.

9     Q.   That was the assistant manager?

10     A.   Right.

11     Q.   Mr. Parker instructed you to fire Jason?

12     A.   Well, he told me to have Jason see him.

13  Jason would not go in to see Mr. Parker, and

14  asked me what Mr. Parker wanted.  I told Jason

15  what Mr. Parker said, because Mr. Parker was

16  upset that I got subpoenaed to court by April's

17  husband at that point.  They were going through a

18  divorce and he subpoenaed me -- she -- he

19  subpoenaed me to court because I knew that Jason

20  and April were seeing each other.

21     Q.   Okay.  And was April an employee?

22     A.   Ex-employee.

23     Q.   All right.  What's her last name?

1    Q.   Okay.  And if Jason Crosby, the

2    assistant manager, was working second shift,

3    April Davis would not be working at the same

4    time?

5    A.   Right.

6    Q.   Okay.  But you got wind of the fact that

7    something had started between the two of them?

8    A.   Yes.  They told me.

9    Q.   All right.  Well, that's pretty good

10   information then if they told you.

11   A.   Yes, they told me.

12   Q.   All right.  Apparently Mr. Parker got

13   wind of it somehow?

14   A.   They were seeing each other before Mr.

15   Parker ever took over the store.

16   Q.   Okay.  All right.  And so it got to the

17   point that finally April Davis' husband had

18   apparently filed for a divorce, and there was a

19   court proceeding, and he subpoenaed you to come

20   to court to testify?

21   A.   Right.

22   Q.   And are you saying that in response to

23   that then --

1    A.    Mr. Parker --

2    Q.    -- Mr. Parker decided to fire Jason

3    Crosby?

4    A.    Well, he didn't know the situation and

5    Cindy did, Cindy Woolover.

6    Q.    Okay.

7    A.    Because I had already went to Cindy with

8    it.  But, like I said, this happened before Mr.

9    Parker took over the store.  But yes, they got

10   wind of it that I knew about it, I got subpoenaed

11   to court.  And Mr. Parker asked me why I was in

12   court and I told him the truth.

13   Q.    Okay.

14   A.    And then he said he wasn't having it,

15   and that's when Jason ended up losing his job.

16   Q.    All right.  And so when Mr. Parker told

17   you he wasn't going to have any part of that, did

18   he tell you he was going to terminate Jason?

19   A.    Yes.  He told me that Jason could no

20   longer work there.

21   Q.    Okay.  But then Jason basically dodged

22   him for a while?

23   A.    Well, I wouldn't say Jason dodged him.

1   I told Jason what he said and Jason just give me

2   his keys.

3       Q.   All right.  So --

4       A.   And Jason would still come into the

5   store and Mr. Parker was still rude and ugly to

6   him.

7       Q.   All right.  So now, is what you're

8   telling me, that during the same conversation

9   where Mr. Parker asked you what you were doing in

10  court, and you explained everything to him in a

11  truthful manner, including the affair between

12  April and Jason, that he made the statement to

13  you, You don't get your --

14      A.   No.  He made that after Jason had

15  already turned his keys in.  He made that

16  statement.

17      Q.   What was the occasion after Jason turned

18  his keys in that the discussion about Jason even

19  came up between you and Mr. Parker?

20      A.   Because he asked me why Jason wasn't

21  there to see him, because Mr. Parker came there

22  to the store to meet up with Jason.

23      Q.   Okay.  And then you explained to Mr.

1  Parker, Well, Jason has quit, he's turned his
2  keys in --
3      A.  Right.
4      Q.  -- he's quit?  And in that conversation
5  Mr. Parker then made the statement to --
6      A.  Right.
7      Q.  Okay.  And how did you respond to that?
8      A.  I just looked at him.  I mean, how can
9  you respond to that?
10     Q.  Well, I mean, I -- for example, did you
11 tell him, Mr. Parker, I don't appreciate that
12 kind of talk?
13     A.  No.  I just looked.  I was shocked.
14     Q.  That's fine.  All right.  Any other
15 instances of inappropriate, unwanted harassing
16 remarks as opposed to touching?
17     A.  Not that I can recall right at this
18 moment.
19     Q.  All right.  And, you know, roughly
20 speaking, when in time was this that you were
21 employed at P&C Grocers that Mr. Parker made this
22 statement to you about paycheck and such?
23     A.  I believe it was -- I believe it was in

1    January sometime still.

2        Q.    Very early?

3        A.    Yes, very early on.

4        Q.    All right.

5        A.    It might have been February.  I'm not

6    sure.

7        Q.    Okay.  So now we've talked about

8    touching.  We've talked about remarks.  Before I

9    move on to religion, is there any other thing,

10    any other instance of inappropriate touching or

11    remarks that you have not told me about?

12        A.    Not that I can think of right offhand.

13        Q.    That's fine.  Now, before I move into

14    the religious aspect, let me ask you this.  The

15    occasions when Mr. Parker was massaging, putting

16    his hands on your shoulders, your neck and that

17    kind of thing, and you told him not to and walked

18    away from him, did you ever tell anybody else

19    about that?

20        A.    Did I ever tell?  Yes, I used to -- I

21    mean, I have customers that seen him do this.

22        Q.    Okay.  Now, what I'm asking, though,

23    specifically, did you ever tell a district

1    manager or did you ever tell Trotman Carroll

2    about this conduct?

3        A.    No.    How do you tell your district

4    manager when Mr. Parker was my district manager

5    as well as the owner.

6        Q.    Okay.    What -- Cindy Woolover, at one

7    time, wasn't she a district manager?

8        A.    Yes, but I was told not to contact Cindy

9    any longer by Mr. Parker.

10       Q.    Then I take it the answer to my

11   question, did you ever tell Cindy Woolover that

12   Mr. Parker was inappropriately touching you, you

13   would say no, you never told her that?

14       A.    Right.

15       Q.    All right.    Did you ever tell Ken Howard

16   that?

17       A.    Ken Howard didn't work for us when Mr.

18   Parker took over.    If he did, I didn't know about

19   it.

20       Q.    Did you ever tell Trotman Carroll about

21   it?

22       A.    I didn't very rare ever see Trotman.

23       Q.    I didn't ask you whether you ever very

1    rarely saw him.

2        A.    No.

3        Q.    Did you ever tell him about it?

4        A.    No.

5        Q.    You knew Trotman Carroll from the days

6    when GOCO Liberty ran the store.   Correct?

7        A.    Right.

8        Q.    And you already told me that he -- while

9    he may not have had ownership, that he was

10   working for Sam Carroll?

11       A.    Right.

12       Q.    So you knew he was involved in the

13   operation of the store?

14       A.    Right.

15       Q.    And you knew when P&C Grocers took over

16   the stores from GOCO Liberty that Trotman Carroll

17   had some kind of ownership interest?

18       A.    Right.

19       Q.    And you knew Mr. Carroll by name,

20   correct?

21       A.    Right.

22       Q.    He, at one time, was your district

23   manager?

1    A.    Right.

2    Q.    All right.  And so did you ever pick up

3    the phone and call him and tell him that Mr.

4    Parker was acting inappropriately towards you?

5    A.    No.

6    Q.    Do you know of anyone else that had any

7    kind of ownership interest in P&C Grocers besides

8    Mr. Parker and Mr. Carroll?

9    A.    I seen Todd a couple of times, but to

10   know him, no.

11   Q.    Okay.  I think I know the answer to

12   this, but did you ever pick up the phone and call

13   Todd and tell him that his father was acting

14   inappropriately towards you?

15   A.    No.

16   Q.    Do you know a man by the last name of

17   Leebo (phonetic)?

18   A.    No, not offhand.

19   Q.    Do you know -- the name Brian Leebo mean

20   anything to you?

21   A.    Not offhand.

22   Q.    Okay.  Do you know of anyone else that

23   you would consider to be in, you know, upper

1    management, higher than you, that was involved in

2    P&C Grocers besides Trotman Carroll and Todd

3    Parker?

4        A.    Not offhand.

5        Q.    Okay.

6        A.    Except for Cindy.

7        Q.    Cindy?

8        A.    Woolover.

9        Q.    Woolover.  All right.  I think we've

10   already established you never told her anything?

11       A.    Right.

12       Q.    Okay.

13       A.    I was not permitted to call her.

14       Q.    Well, nothing would have stopped you

15   from calling her from your house, correct?

16       A.    I was told I wasn't allowed.

17       Q.    By who?

18       A.    By Mr. Parker.

19       Q.    All right.  And when did he tell you not

20   to call Ms. Woolover?

21       A.    I think he told me when he was getting

22   the two Cindys confused.

23       Q.    Cindy Garrett and Cindy Woolover?

1    A.   Right.

2    Q.   Cindy Woolover, early on with your

3  employment with P&C Grocers, Cindy was a district

4  manager?

5    A.   Right.

6    Q.   Was she terminated?

7    A.   No.  She's still -- I don't know if she

8  was terminated from P&C.  She was there when I

9  left.

10    Q.   All right.  But from your day-to-day

11  working operations, Mr. Parker took over her role

12  as district manager?

13    A.   For the Alabama stores, yes.

14    Q.   And Cindy had the Florida stores?

15    A.   From what I understood.

16    Q.   And what occasion was it that Mr. Parker

17  told you not to call Cindy Woolover?

18    A.   I can't remember right offhand what -- I

19  think I was talking about Cindy, my employee.

20    Q.   Cindy Garrett?

21    A.   Right.  And I think he thought I was

22  talking about Cindy Woolover, and then he told me

23  not to contact Cindy.  And I'm like, well, that's

1    kind of hard to do.

2        Q.    All right.

3        A.    And then I realized he was talking about

4    Cindy Woolover and not the Cindy from my store.

5        Q.    So was this -- what you're telling me

6    about was the period of time that Cindy was still

7    a district manager?

8        A.    Not for my store.  I didn't know she

9    wasn't until Mr. Parker told me not to be calling

10   her no more.

11       Q.    Okay.

12       A.    But I knew she had not been to the store

13   in a while.  They didn't let us managers know the

14   business aspect of how they would do things.

15       Q.    All right.  Okay.  Now, let's move into

16   your allegations here that he discriminated

17   against you on the basis of religion.  Okay?

18   Now, the complaint says that the defendant, that

19   would be P&C Grocers and Mr. Parker,

20   intentionally and maliciously discriminated

21   against you on the basis of your religion.  What

22   was your religion at the time that you were

23   working at P&C Grocers?

1    like that?  Did you ever have any discussion with

2    him like that?

3       A.    Just the same conversation me and Mr.

4    Parker had all the time, you need to be in

5    church.  He wanted me to go to church.  I needed

6    to pray.  I needed to do this.

7       Q.    Did you ever sit down and have a

8    one-on-one meeting with Mr. Parker where he asked

9    you what it is that you believed in, what your

10   religious practice was?

11      A.    Mr. Parker asked me if I believed in

12   God.

13      Q.    Okay.  All right.

14      A.    But I also believe everybody believes in

15   their own ways.

16      Q.    I asked you whether Mr. Parker ever told

17   you that unless you stopped doing some religious

18   activity he was going to terminate you, and you

19   said no.  Now, I'm going to ask the opposite.

20   Did Mr. Parker ever tell you that unless you

21   started doing some particular religious activity

22   that he was going to terminate you?

23      A.    He didn't say he was going to terminate

1    me for them reasons, no.

2        Q.   All right.  Did -- well, then you tell

3    me just in your own words what it is that you're

4    complaining about with regard to Mr. Parker and

5    your religious belief.

6        A.   I don't need someone coming and talking

7    to me and -- I mean, every time he came in the

8    store that was another conversation was church --

9        Q.   Okay.

10        A.   -- and God.  And I don't know if Mr.

11    Parker thinks he is God or what, but when I went

12    to church, you didn't judge people the way Mr.

13    Parker did.  I was not -- I mean, I had one

14    employee that refused to work on Sunday because

15    of church.  Well, you can't fire him because he

16    won't come in on Sunday because of church.

17    Church was a big issue for Mr. Parker.  He wanted

18    me in the church.

19        Q.   Did he tell you that you would lose your

20    job if you did not start attending church?

21        A.   No.

22        Q.   When you say he wanted you in church,

23    what do you mean?

1    A.    Because he told me I needed to start

2    going to church.

3    Q.    Did he tell you which church to start

4    going to?

5    A.    No.

6    Q.    So no specifics, no particular church,

7    just a general statement you need to start going

8    to church?

9    A.    And getting my life right with God.

10    Q.    You needed to get your life right with

11    God.  But he did not tell you that if you did not

12    start going to church that he was going to

13    terminate you?

14    A.    No, he didn't come out -- he never told

15    me he was going to terminate me.  I just found

16    out that he was.

17    Q.    You're talking about back when Wanda

18    Short was hired?

19    A.    Right.  He never come out and said I'm

20    going to terminate you for anything.

21    Q.    Okay.  So this is not a situation where

22    -- and I'm not suggesting Mr. Parker is, let's

23    say, Catholic.  It's not a situation where he's

1    church, you need to get your life right with God,

2    did it have anything to do with your drinking?

3        A.    Yes.   Mr. Parker complained about me

4    drinking, yes.

5        Q.    Okay.   And during the period of time,

6    the six months that you were working at P&C

7    Grocers, did you have a problem with drinking?

8        A.    I drank.

9        Q.    Well, did you ever have --

10       A.    I'm not going to say no, I don't --

11       Q.    Did you have any problem with it?

12       A.    No, I don't believe so.

13       Q.    All right.   You drank, but you say you

14   didn't have a problem with it?

15       A.    I don't believe so.

16       Q.    All right.   Did you ever drink on the

17   job?

18       A.    No.

19       Q.    Did you ever call people at work while

20   they were working and you were at home after you

21   had been drinking?

22       A.    I'm sure I did call them to tell them to

23   do something or they'd call me for something.

1    Q.   So outside of a specific instruction by
2    you to an employee, or them calling you for a
3    specific answer to a question, is it your
4    testimony that you never called employees at work
5    after you were at the house drinking?
6    A.   I never called them?  No, I can't say I
7    never called my employees.
8    Q.   Okay.
9    A.   And I won't say that, because I have
10   called them.
11   Q.   And specifically, do you admit that
12   there were occasions when, after you went home
13   and you had been drinking a while and became
14   intoxicated, that you called the store and talked
15   to employees?
16   A.   I wouldn't say I was intoxicated.
17   Q.   So you would deny being intoxicated?
18   A.   I'm not going to say I've never been
19   intoxicated.
20   Q.   Well, I'm specifically asking you
21   whether that happened.
22   A.   I couldn't tell you for sure or not, but
23   --

1      Q.   So if an --

2      A.   I'm sure I have talked to them while

3    I've been drinking.

4      Q.   If an employee of P&C Grocers, while

5    they were working at the store, testified that

6    you called him or her in an intoxicated state,

7    rambling, talking about nonstore business for --

8    and kept them from doing their jobs, would those

9    people be telling the truth?

10     A.   Not exactly, no.

11     Q.   Well, what is not exactly?

12     A.   Well, because Cindy Garrett and I used

13   to be best friends, so Cindy would call me and

14   I'd call her when something occasionally would go

15   on with either one of us.  So, I mean, yes, Cindy

16   and I have talked about stuff that didn't concern

17   the store.

18     Q.   You've seen the statements that Mr.

19   Parker sent to the Equal Employment Opportunity

20   Commission, haven't you?

21     A.   What statements would those be?

22     Q.   The statements that Cindy Garrett and --

23     A.   Yes, I did.

1     Q.   Okay.  All right.  Now, do you deny it

2  as to the other people that provided the

3  statements about the same thing?

4     A.   Ms. Dora and I never spoke much.  We --

5  I mean --

6     Q.   And how about Cindy Woolover?

7     A.   Cindy Woolover was the manager, or

8  district manager.  I never talked to her at my

9  store unless she came in or I called her on the

10  phone from the store when I was at the store.

11     Q.   So you deny what she's put in her

12  statement?

13     A.   That I have talked to Cindy drinking?

14     Q.   Yes.

15     A.   No, I'm not going to say that's not

16  true, because that is true.  I have talked to

17  Cindy while I was drinking.

18     Q.   While Cindy was on the job?

19     A.   Well, Cindy stayed on the job 24.

20     Q.   Well, I'm talking about while she was on

21  the job, not when she was at the house on call.

22     A.   No.

23     Q.   I mean, she didn't work 24 hours a day

1    at the store?

2        A.   No.   Cindy didn't work at a store, but

3    she was on call always.

4        Q.   Okay.   All right.   Now, how about Evelyn

5    Husbands?   Have you read her statement?

6        A.   I sure did.

7        Q.   She's the lady that sells Avon?

8        A.   That's Cindy's mom.

9        Q.   You read her statement?

10       A.   I sure did.

11       Q.   Where she said she came into the store

12   and she saw you drinking out of a bottle

13   underneath the counter?

14       A.   Not true.

15       Q.   Did you see the statement?

16       A.   Yes.

17       Q.   Do you deny it?

18       A.   Yes.

19       Q.   Okay.   Did you see in her statement

20   where she said you took money out of the cash

21   register to pay for Avon products?

22       A.   Yes, I seen it.

23       Q.   Is that true?

1    Q.    And you spoke on several occasions?

2    A.    Yes.

3    Q.    More than one occasion, correct?

4    A.    Yes.

5    Q.    And you seen her statement?

6    A.    Yes, I read her statement.

7    Q.    She says in here, She would call me

8    daily at work while drinking and keep me on the

9    phone for extended periods of time.  She would

10   talk about her personal life, problems she was

11   going through, employees with money shortages,

12   and how she couldn't understand what was wrong

13   because she and I could run a drawer together

14   without shortages.  And on several occasions,

15   just be a breathing sound on the other end of the

16   line.  Is that true?

17   A.    What are you asking in what is true?

18   Q.    We can break it down.  She would call me

19   daily at work while drinking.  Is that true?

20   A.    We talked everyday, whether I was

21   drinking, or whether she called me or whether I

22   called her, yes.

23   Q.    Well, I'm asking is it true that you,

1    Cecelia Gibbs, would call Cindy Garrett daily at

2    work while you were drinking?

3        A.    I would say yes to that.

4        Q.    And is it true that you would keep her

5    on the phone for extended periods of time?

6        A.    She could hang up any time she wanted

7    to, but no, that's not true.

8        Q.    Okay.  She would talk about her personal

9    problems she was going through.  Is that true?

10       A.    Yes, we both did that.

11       Q.    CC had -- is that what -- were you --

12   did you have a nickname, CC?

13       A.    Yes.

14       Q.    CC has a history of panic attacks, and

15   while she was living with Mr. Jerry Seay,

16   S-e-a-y, in Eunola, she called me at home during

17   two separate attacks to come get her medication

18   from the bathroom for her because she couldn't

19   breathe.  Is that true?

20       A.    No.  Panic attacks, yes.  But is that

21   true, no.

22       Q.    Or calling her to come get your

23   medication --

1  and you can tell by her slurred speech.  Do you

2  deny that?

3      A.   No, I probably have talked to Cindy.  If

4  the store had problems, I guarantee I called her.

5      Q.   Well, would you be calling from the

6  store drunk?

7      A.   No.

8      Q.   So you're saying the only time you would

9  call Cindy Woolover is if there was a problem at

10  the store?

11      A.   If there was a problem at the store and

12  I was at home.

13      Q.   But you don't deny that you called her

14  on occasions drunk?

15      A.   Right.

16      Q.   I'm not -- I'm wanting to make sure I

17  understand this.  Are you saying that there were

18  occasions when you would leave work, you would go

19  home, you would start drinking, you would get

20  drunk, and then somebody at the store would call

21  you with a problem that would cause you to call

22  Cindy Woolover?

23      A.   There have been times, yes.