```
1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE MIDDLE DISTRICT OF ALABAMA
3                        SOUTHERN DIVISION
4                                                      COPY
5    CECELIA GIBBS,                 )
6         Plaintiff,                )
7    VS.                            )  CASE NO. 1:05-CV-912-T
8    P&C GROCERS, INC., and         )
9    CHARLES PARKER,                )
10   individually, and as an        )
11   agent for P&C GROCERS,         )
12   INC.,                          )
13        Defendants.               )
14
15
16        The deposition of CHARLES PARKER, taken
17   pursuant to Federal Rules of Civil Procedure
18   before Lisa M. Bryan, Court Reporter and Notary
19   Public, State at Large, at the Law Offices of
20   Charles W. Blakeney, 201 North Commerce Street,
21   Geneva, Alabama, on the 20th day of February,
22   2006, at approximately 2:00 p.m., pursuant to
23   notice.
```

EXHIBIT B

1  Florida.
2      Q.   Okay.  And did you own them through an
3  entity called P&C Grocers?
4      A.   Yes, sir.
5      Q.   Is that incorporated?
6      A.   Yes, sir.
7      Q.   And what's the full name of P&C Grocers,
8  if it's different from what I have?
9      A.   It's not different.  It's -- that's the
10 full name.
11     Q.   Okay.  And when --
12     A.   P&C Grocers, Inc.
13     Q.   And when did you incorporate?
14     A.   I believe it was January, between the
15 1st and the 5th of '04.
16     Q.   And who was the president of the
17 corporation?
18     A.   I was.
19     Q.   Okay.  And were there any other
20 officers?
21     A.   Yes, sir.
22     Q.   Who were the other officers?
23     A.   Mr. Bryan Leebo was vice president and

```
1    Mr. John Trotman Carroll was secretary.
2         Q.    Any other officers?
3         A.    No, sir.
4         Q.    Any other employees that did not
5    directly work in a store?
6         A.    I don't understand.
7         Q.    Were there any other employees that did
8    not work directly in a store --
9         A.    Yes, sir.
10        Q.    -- in one of the nine stores?
11        A.    Yes, sir.
12        Q.    Who were the other employees?
13        A.    Todd Parker.
14        Q.    Okay.
15        A.    Jennie Vasquez.
16        Q.    Okay.
17        A.    We had another girl that just did store
18   reports.  I don't remember her name.  And my
19   daughter worked part-time, Nichole Parker, on
20   store reports.
21        Q.    I'm sorry?  Her name was?
22        A.    Nichole.
23        Q.    Nichole.  And she assisted and did store
```

1  reports?
2      A.  Yes, sir.  We had Russ Wilberton that
3  was maintenance man that didn't work directly in
4  a store.
5      Q.  And as far as ownership of this
6  corporation, how was the ownership divided out,
7  if any?
8      A.  I owned 34 percent of the stock, John
9  Trotman Carroll and Bryan Leebo owned 33 percent
10 each.
11     Q.  Okay.  Did you ever assert to CC the
12 ownership of this company?
13     A.  No, sir.
14     Q.  As far as she was concerned, you were --
15     A.  No, sir.
16     Q.  -- P&C Grocers?
17     A.  She knew that John Trotman Carroll owned
18 part of it.  I don't think -- Bryan Leebo did not
19 get involved in the operation.  John Trotman
20 Carroll was involved in the operation, visited
21 the stores and so forth.
22     Q.  So Bryan was sort of a silent partner --
23     A.  Yes, sir.

```
 1    Q.    -- I guess?
 2    A.    He lived in Birmingham, yes, sir.
 3    Q.    And all of the rest of the people you
 4  mentioned worked under you, under your
 5  supervision?
 6    A.    Under mine and John Trotman Carroll.
 7    Q.    Okay.  And you say that you were
 8  incorporated sometime between January 1st and
 9  January 5th?
10    A.    Sometime shortly before we bought the
11  store January 5th, or we leased the stores first.
12    Q.    So you actually bought the stores or
13  leased the stores on January 5th, which I believe
14  was the date --
15    A.    That's the day we took them over, yes,
16  sir.
17    Q.    -- that you went in to inventory?
18    A.    Yes, sir.
19    Q.    Okay.
20    A.    And we had a lease purchase and we
21  operated them under that lease purchase until
22  sometime in April.  And we, at that time, closed
23  the financing out and bought them.
```

1   A.   I don't.  I believe that was in May, but
2  I'm not sure.  April or May.
3   Q.   Could you provide me with any handouts
4  that were handed out at that meeting?
5   A.   I will try.  I don't have them with me,
6  no, sir.
7   Q.   That --
8   A.   Hopefully they have something at the
9  office.
10   Q.   Through your attorney, I mean.  Is it
11  your position that this meeting happened prior to
12  your decision to terminate CC?
13   A.   Yes, sir.
14   Q.   Okay.  Do you have any write-ups
15  relating to CC's performance?
16   A.   No, sir.
17   Q.   Did you accomplish or memorialize any
18  write-ups relating to CC's performance?
19   A.   No, sir.
20   Q.   What is your position relating to why
21  you terminated CC's employment?
22   A.   Her drinking problems, calling me at
23  night, 9:00, 10:00, 11:00 at night.  Sometimes

```
 1    I'd be asleep and my wife would talk to her.  If
 2    I was at the store real early in the morning, you
 3    could smell alcohol on CC's breath bad a lot of
 4    mornings.  I didn't say every morning.  I said a
 5    lot of mornings.  And that's why I talked to her
 6    about her drinking problem, because if it could
 7    be smelled on her in the store, then it was a
 8    problem to me.
 9        Q.   How close did you get to her to be able
10    to smell her?
11        A.   You didn't have to get too close.
12        Q.   Not too close?
13        A.   No, sir.
14        Q.   And do you have any kind of training in
15    detecting whether somebody may be intoxicated or
16    whether somebody may be drinking, other than just
17    our normal life experiences?
18        A.   Nothing except my experience, but I've
19    been in management all of my life, so -- all of
20    my working life.
21        Q.   Okay.  Do you run into that a lot?
22        A.   No, sir.  No, sir.  The problems you run
23    into are not something you can smell.
```

1  you when drinking late at night, and sometimes
2  you could smell -- more than half of the time,
3  you could smell alcohol on her breath whenever
4  you happened to come down --
5      A.   In the store.
6      Q.   -- in the store?
7      A.   Yes, sir.
8      Q.   Okay.
9      A.   And you could certainly smell it across
10 the counter.
11     Q.   Did she --
12     A.   And my partner, John Trotman Carroll,
13 had told me numerous times -- he said, I've told
14 CC don't ever call me again when she's drinking.
15     Q.   Uh-huh.
16     A.   He said, If she does, you won't have to
17 worry about terminating her, I will terminate
18 her.
19     Q.   Uh-huh.  Okay.  Would you say that the
20 date of the meeting in Florala was the first time
21 you addressed the issues of discrimination and
22 sexual harassment with all of your supervisory
23 employees?

```
 1  so I didn't know.
 2       Q.   And you weren't told of any -- again,
 3  I'm going to use the term wrongful conduct -- at
 4  the store or during store time?
 5       A.   No one told me they were in the store
 6  doing anything that they wouldn't want people to
 7  see, or if they were doing things, people didn't
 8  want to see.
 9       Q.   Okay.  Did you make the statement that
10  CC asserts you said?
11       A.   No, sir.
12       Q.   So you didn't make the statement?
13       A.   Not that statement, no, sir.
14       Q.   Did you say anything similar to that?
15       A.   I believe I did.
16       Q.   What did you say?
17       A.   It is not policy -- you do not dip your
18  pin in the company's ink.
19       Q.   You don't dip your pin in the company's
20  ink?
21       A.   Yes, sir.
22       Q.   Okay.  And you didn't get any more
23  graphic than that?
```

```
 1      Q.    -- pat on one shoulder?
 2      A.    Yes, sir.
 3      Q.    That patted but did not move around?
 4      A.    That's right.
 5      Q.    Okay.  And you never touched her in a
 6   way that would be interpreted as rubbing?
 7      A.    Mr. Blakeney, I have never touched any
 8   female, other than my wife, one of my -- both of
 9   my wives --
10      Q.    Uh-huh.
11      A.    -- in a sexual manner.  Definitely not
12   an employee.
13      Q.    Okay.
14      A.    Never.
15      Q.    Well -- and I guess that goes ahead and
16   answers my next question.  Did you touch any --
17   for the record, did you touch anyone else in a
18   way that could be interpreted as a rubbing of the
19   shoulders?
20      A.    I touched other people, but I wouldn't
21   consider it rubbing or -- no, sir.
22      Q.    Did you ever touch CC or these other
23   people with both hands at the same time?
```

```
 1      A.    Yes, sir, I've patted people on the
 2   back.
 3      Q.    Okay.  And then did you pat people on
 4   the shoulder?
 5      A.    Yes.
 6      Q.    And did you ever rest your hand on a
 7   back or a shoulder for more than two seconds?
 8      A.    I could have.  I believe the incidents
 9   that CC referred to when I asked her to sit down
10   and let me go over these problems --
11      Q.    Uh-huh.
12      A.    -- I probably had my hand on her
13   shoulder more than two seconds.  And I asked her
14   to sit down and not be walking off, because we
15   had to find out what happened on that over ring
16   the next day.
17      Q.    Yes, sir.
18      A.    Because it was obvious after we dug into
19   it that there was a mistake.  But it was obvious
20   at that time -- it was not obvious whether
21   somebody had written this over ring up just to
22   take $60.00 or not, and I had to find out.
23      Q.    I believe her testimony was that you had
```

1  ahold of her arms at that time.
2      A.   I don't believe so, but I could have.  I
3  don't know.
4      Q.   Okay.  And that you sat her down.  Do
5  you agree that that's the way it happened?
6      A.   I don't know if I sat her down or not.
7  I do not remember.
8      Q.   When did you have a meeting with several
9  of your employees relating to CC's drinking
10 problem?
11     A.   I have -- I do not remember when it was.
12     Q.   Was it after she was terminated?
13     A.   No, sir.
14     Q.   It was before she was terminated?
15     A.   Yes, sir.
16     Q.   Okay.  You assert that that meeting did
17 take place?
18     A.   Yes, sir.
19     Q.   And who was present?
20     A.   Ms. Dora -- I'm not sure.  It's in those
21 letters that was there.  I'm not sure of the
22 girl's name.  One of them didn't even work for
23 us.

```
 1      Q.   Well, from your memory -- and I
 2   understand that the statement is the statement,
 3   but from your memory, who do you remember being
 4   there?
 5      A.   Ms. Dora was there and I do not remember
 6   the other peoples' names.  There were three of
 7   them.
 8      Q.   Ms. Dora and two other people --
 9      A.   Yes.
10      Q.   -- or Ms. Dora and three other people?
11      A.   Two other people.  I believe I'm
12   correct.
13      Q.   And did you document this meeting in any
14   way?
15      A.   No, sir.  I took some notes of what they
16   told me, but I didn't keep no records of that.
17      Q.   Do you still have those notes?
18      A.   No, sir.
19      Q.   And this is a meeting relating to a
20   complaint against CC, who is the highest manager
21   at one of your stores?
22      A.   Yes, sir.
23      Q.   And you took no action?
```

1  A. I talked to CC about the complaints I
2  had. I didn't tell her it was her employees, one
3  or two of them that met with me, no, sir.
4  Q. And you didn't document it in any way?
5  A. No, sir. And I didn't ask for the
6  meeting. They did. And when I went to the
7  meeting, I had no idea what the meeting was
8  about. They just asked me if they could have a
9  meeting with me.
10 Q. So in your initial discovery when your
11 attorney for you stated that you would provide
12 the policy manual maintained on the premises of
13 the store where plaintiff was manager, that would
14 only be a manual that was there possibly for the
15 last three or four weeks of her employment; is
16 that true?
17 A. I believe it will be longer than that,
18 but a short time, yes, sir.
19 Q. Okay. Well, how much time passed after
20 the Florala meeting before the manual was placed
21 in the stores?
22 A. After the Florala meeting before the
23 manual was placed in the store?

1  did you recommend that she go to church?
2  A.  CC had -- I had been talking about her
3  drinking.  And she wanted to know what can I do,
4  I need some help.  I said go to your preacher and
5  those people know some people that's in that
6  business of helping folks.  I don't go to church.
7  I said, Well, then why don't you try going to
8  church and talk to that preacher.  Maybe he can
9  help you.
10  Q.  Okay.
11  A.  Yes, sir, I did that.
12  Q.  And did you do that just one time or
13  multiple times?
14  A.  No, sir, one time.
15  Q.  One time.  You never discussed religion
16  with her in any way other than that one time?
17  A.  I don't say that I didn't ever bring
18  religion up, but not in no way suggesting that
19  anything about her religion, no, sir.
20  Q.  And was anybody present when that
21  happened?
22  A.  Not to my knowledge, no, sir.
23  Q.  And did you take any of your actions

1    Q.    -- Gibbs?

2    A.    Yes.

3    Q.    Correct?

4    A.    Yes, sir.

5    Q.    All right. And when you met with the
6 three -- the employees, when you met with them --
7 one of them wasn't an employee, two employees and
8 the other person -- when you met with them, did
9 they tell you about any problems that were being
10 caused with customers of the stores due to Ms.
11 Gibbs' conduct?

12   A.    The lady that was there with them that
13 was not an employee, was supposedly there as an
14 interested customer, that she had smelled alcohol
15 on her, and she more or less verified what the
16 other two was telling me. And I didn't comment.
17 I took notes. I told them I would get into it
18 and check it out, that I'd talk to CC about it.

19   Q.    All right. Now, are you satisfied that
20 you had discussions with Ms. Gibbs about the fact
21 that it had been reported to you and that you
22 yourself had observed that she had a drinking
23 problem and that she needed to do something in