**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CECELIA GIBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:05-cv-912-MHT** |
| | ) | |
| **P & C GROCERS, INC., AND** | ) | |
| **CHARLES PARKER, INDIVIDUALLY** | ) | |
| **AND AS AN AGENT FOR** | ) | |
| **P & C GROCERS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants P & C Grocers, Inc. (hereinafter "P&C") and Charles Parker (hereinafter "Parker") pursuant to Rule 56, FEDERAL RULES OF CIVIL PROCEDURE, and move the Court to enter Judgment as a matter of law in their favor and as grounds for same show unto the Court as follows:

**STATEMENT OF FACTS**

Plaintiff, Cecila Gibbs (hereinafter "Gibbs"), was an employee of P&C, working at its convenience store located in Eunola, Alabama. Gibbs had been employed at this particular convenience store on and off for approximately four years through various owners. (Gibbs Depo., attached hereto as Exhibit "A", pp. 17-24). During this period, prior to being employed by P&C, Gibbs was eventually promoted from clerk to manager. (Exhibit "A", p. 10). In January 2004, P&C was formed and, shortly thereafter, the store at which Gibbs was employed

was lease-purchased by P&C. (Exhibit "B", p. 12). Defendant Parker is President and a 34% shareholder of the corporation. (Exhibit "B", pp. 9-12). John Trotman Carroll (hereinafter "Carroll") is also an owner and 33% shareholder. (Exhibit "B", p. 11). Carroll had been involved in management of the store when it was owned by P&C's predecessor and had been the district manager over the stores acquired by P&C. (Exhibit "B", p. 11; Exhibit "A", pp. 17, 18, 50). After P&C acquired this and other stores, Parker acted as the district manager over some of the stores including the store at which Gibbs was employed and would come to the store once or twice a week to check on the store. (Exhibit "A", p. 48). Gibbs also testified that Carroll and Cindy Woolover, who was also a district manager, would occasionally come to the store to check on things as well. (Exhibit "A", p. 50).

Gibbs claims that Parker touched or rubbed her shoulders every time he came into the store, beginning with his first visit. (Exhibit "A", p. 65). Gibbs did not feel this was appropriate and claims she asked Parker to desist. (Exhibit "A", p. 72). Parker concedes that he may have patted Gibbs on the back or shoulder while talking to her but never moved his hand around or touched her in any way that could be interpreted as rubbing. (Exhibit "B", p. 38).

Gibbs contends there was one occasion where Parker grabbed her by the shoulders and made her sit down. (Exhibit "A", pp. 75, 77). Parker admits he may have put his hands on her shoulders to keep her from walking away. (Exhibit "B", p. 41). Both parties agree that this isolated incident occurred when Parker was trying to get to the bottom of a situation wherein one of the employees at the store came up $60.00 short in their register. (Exhibit "A", p. 35). According to Gibbs, one of her employees came up short, he actually misplaced the money and made up the over ring thing. (Exhibit "A", p. 75). She claims Parker grabbed her by her arms

and sat her down so he could discuss it. (Exhibit "A", p. 75). However, she admits that this encounter was not sexual because Parker was actually accusing either Gibbs or the other employee of stealing. (Exhibit "A", p. 77).

Sometime in January or February 2004, Parker learned that a married, male employee was having an affair with another married employee whose husband had filed for divorce and subpoenaed Gibbs to testify. (Exhibit "A", pp. 92-96). Parker found out about this situation when Gibbs was subpoenaed. (Exhibit "A", p. 96). Parker was not happy about the relationship between these co-employees and advised Gibbs that he would not tolerate that behavior at the store and that particular employee was no longer allowed to work at the store. (Exhibit "A", p. 93). Gibbs advised the employee that he was to be terminated and he tendered his store keys. (Exhibit "A", p. 94). Parker came to the store to discuss the situation with the employee but the employee was not at the store. (Exhibit "A", p. 94).

Parker inquired of Gibbs why the employee didn't come to the store for the meeting and Gibbs advised Parker that the employee had resigned and turned in his keys. (Exhibit "A", pp. 94-5). In response, Gibbs claims that Parker said to her "you don't get your pussy where you get your paycheck." (Exhibit "A", p. 89). Parker denies making that statement, but does admit that he said, "You don't dip your pen in company ink." (Exhibit "B", p. 35). The remark attributed to Parker by Gibbs is the only harassing remark Gibbs contends that Parker made. (Exhibit "A", p. 96). Gibbs did not respond to this comment nor do or say anything to indicate to Parker that she was offended by this comment or that she felt it was inappropriate. (Exhibit "A", p. 95).

According to Gibbs, from time to time, when Parker came to the store, he would tell her that he wanted her to go to church, she needed to pray and asked her whether she believed in God.

(Exhibit "A", p. 105). Gibbs admits that Parker did not tell her that she would be terminated if she did not attend church. (Exhibit "A", p. 106). Rather, Gibbs concedes that these statements were often accompanied with Parker expressing his concern about her drinking. (Exhibit "A", p. 109). According to Parker, he and Gibbs had been discussing her drinking and she had asked for help, at which point he advised her to go to her preacher because they are in the business of helping people. (Exhibit "B", p. 65). Gibbs told Parker that she did not go to church and she didn't have a preacher to go to see, which prompted Parker to suggest she should try going to some church and talk to a preacher. (Exhibit "B", p. 65). Gibbs denies ever drinking alcohol at the store, but admits that she has called from home when intoxicated to speak to employees working at the store. (Exhibit "A", pp. 110-111). Parker further claims that there were multiple occasions where Gibbs called him at home at night and he could ascertain from her slurred words that she was intoxicated. (Exhibit "B", pp. 17, 18). Parker also stated that there were several mornings when he'd arrive at the store early, before the store opened to be there when Gibbs arrived, and could smell a strong odor of alcohol on Gibbs' breath. (Exhibit "B", p. 18). Gibbs admits that she called the store daily and spoke with Cindy Garret, a store clerk, while Cindy was working and sometimes it was after Gibbs had been drinking alcohol. (Exhibit "A", pp. 115, 127-8). Gibbs further admits that she has called district manager, Cindy Woolover, at night, at home after Gibbs had been drinking. (Exhibit "A", pp. 116, 140).

In or about April/May 2004, there was a managers' meeting held which Gibbs attended. (Exhibit "A", p. 54). Present at the meeting were the owners of the company, the district managers and the all of the store managers, including Gibbs. (Exhibit "A", p. 51). During the meeting, the P&C's Employee Handbook was read aloud and a copy was disseminated to all

4

managers to be kept on their store premises. (Exhibit "A", p. 58). Upon returning from the meeting, Gibbs held an employee meeting during which she went over the handbook with all of the employees. (Exhibit "A", p. 59). Gibbs admitted that there was a section of the handbook that specifically addressed sexual harassment. (Exhibit "A", p. 60). It was Gibbs' understanding that every employee was to read the handbook and sign an acknowledgment form attesting that they have read the handbook. (Exhibit "A", p. 61). Gibbs also admitted that there was a sexual harassment/discrimination poster displayed on the wall near the bathroom at the store throughout the four years. (Exhibit "A", p. 45).

According to Gibbs, sometime shortly after the managers' meeting, Parker came into the store and again rubbed her shoulders. (Exhibit "A", pp. 81-2). She testified that on this occasion, she got ugly with him and told him to quit and either she or Parker walked away. (Exhibit "A", pp. 81-2). Gibbs also stated that Parker did not react to her comment nor did he resume touching her again. (Exhibit "A", p. 82). She can think of no time after this particular incident where Parker came into the store and touched her inappropriately. (Exhibit "A", p. 83).

At some point prior to Gibb's termination, Parker testified that two employees of the store requested a meeting with Parker. (Exhibit "B", p. 42). Parker did not know the purpose of the meeting until his arrival; however, he noted there was a store customer in attendance in addition to the two employees. (Exhibit "B", pp. 42-3). The three women told Parker about problems Gibbs was causing with the co-employees and with customers due to Gibbs' erratic conduct and that they smelled alcohol on her when she was in the store working[1]. (Exhibit "B", p. 72).

_____

[1] See attached Affidavits of Cindy Garrett and Dora Harmon attesting to the fact that they advised Parker of their complaints relating to Gibbs' drinking and its interference with her

5

Parker thereafter talked to Gibbs about the complaints he'd received from the co-workers and customer. (Exhibit "B", p. 44). This occurred prior to Gibbs' termination. (Exhibit "B", p. 42).

A few weeks after this incident, Gibbs learned that someone had been hired to replace her and called Parker at his home to confront him. (Exhibit "A", p. 84). Parker told Gibbs they would discuss the matter the following day. (Exhibit "A", p. 84). The following day, Gibbs went to work, then left the store within forty-five minutes because she was upset that she was going to be fired. (Exhibit "A", p. 87). Gibbs called another employee into the store to cover her shift and went home. (Exhibit A, p. 87). Gibbs testified that Parker called her at home from the store: "He basically told me that I needed to get my life right with God. I needed to quit drinking. And when I did those things, to call him back and he may put me back to work, but for now he was letting me go." (Exhibit "A", p. 88). Gibbs was fired by Parker over the telephone. (Exhibit "A", p. 84). Parker claims his reason for firing Gibbs was based upon:

> Her drinking problems, calling me at night, 9:00, 10:00, 11:00 at night. Sometimes I'd be asleep and my wife would talk to her. If I was at the store real early in the morning, you could smell alcohol on CC's breath bad a lot of mornings. I didn't say every morning. I said a lot of mornings. And that's why I talked to her about her drinking problem, because if it could be smelled on her in the store, then it was a problem to me.

(Exhibit "B", pp. 17-18). Parker further stated that his partner, Carroll, had told Parker that Gibbs called him while intoxicated and he had told Gibbs not to call him anymore when she'd been drinking. (Exhibit "B", p. 31). Carroll also told Parker that if he did not fire Gibbs that he

---

work. (Attached hereto as Exhibit "C").

(Carroll) would fire her.  (Exhibit "B", p. 31).  Gibbs was terminated in June 2004.  (Exhibit "A", p.28).

Gibbs has admitted that she did not report any of the incidents made the basis of her claims to anyone.  (Exhibit "A", p. 97).  She did not tell Cindy Woolover, who she believes to be in upper management at P&C, and who she has known for years.  (Exhibit "A", pp. 97,99).  She did not tell John Trotman Carroll, although she'd also known him for years, as his brother was a previous owner of the convenience store and he was involved in management.  (Exhibit "A", p. 98).  Gibbs admits that she was aware that John Trotman Carroll had an ownership interest in P&C and knew him by name; he had previously been her district manager, but she did not call him at home to report anything she claims Parker said or did.  (Exhibit "A", pp. 98-9).  Gibbs did not report any of the alleged instances of Parker's inappropriate conduct or remarks to anyone. (Exhibit "A", pp. 97-102).

After her termination, Gibbs filed a claim with the Equal Employment Commission based upon allegations of sexual and religious harassment.  An investigation was conducted and Parker responded to the charge and submitted several sworn affidavits.  (Response and affidavits attached hereto as Exhibit "D").  The EEOC  issued a Dismissal and Notice of Rights letter which indicated "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  This finding was issued on June 28, 2005.  (Right to Sue letter, attached hereto as Exhibit "E").

Plaintiff initiated this lawsuit on September 23, 2005, alleging claims under Title VII, 42 U.S.C. Section 2000(e), *et seq.*, the "Civil Rights Act."  Plaintiff's Complaint seeks relief for the following: Count I: "Sexual Harassment, Discrimination and Retaliation"; Count II: "Religious

Discrimination"; and Count III: "Intentional Infliction of Emotional Harm." Plaintiff's claims are due to be dismissed as a matter of law and summary judgment is due to be granted in favor of the Defendants for the reasons enumerated herein.

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c), FED.R.CIV.P., the moving party is entitled to a judgment as a matter of law where no genuine issues as to any material fact exists. The moving party bears the initial burden of proof of showing the absence of any genuine issue of material fact on the matters covered by the Motion for Summary Judgment, but, once the moving party has sustained its burden, the burden then shifts to the non-moving party to demonstrate by "substantial evidence that genuine issues of material fact do exist to warrant the matter being submitted to the finder of fact." *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994), opinion modified on rehearing 30 F.3d 1347 (11th Cir. 1994).

In interpreting the substantial evidence rule, the United States Supreme Court has held that [t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.

*Anderson*, 106 S.Ct. at 2511; citing *Adickes v. S.H. Kess & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Dombrowski v. Eastling*, 387 U.S. 82, 87, S.Ct. 1425, 18 L.Ed.2d 577 (1967). A summary judgment must be granted, under the undisputed facts, if the

moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); *Real Estate Financing v. Resolution Trust Corp.,* 950 F.2d 1540 (11th Cir. 1992), rehearing denied. Furthermore, if the non-moving party fails to establish a genuine issue of fact as to an essential element of his case, then the moving party is entitled summary judgment as a matter of law.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

To successfully defeat a motion for summary judgment, the non-moving party must offer evidence of specific facts showing a genuine issue of fact for trial.  *United Steelworkers of America, AFL-CIO v. University of Alabama,* 599 F.2d 56, 61 (5th Cir. 1979).  The non-moving party must show more than mere allegations and conclusory statements.  *Id.*  When a party moving for summary judgment "supports his motion with documents evidencing a high degree of credibility, the opponent must produce convincing proof attacking the documents in order to defeat the motion." *Hales v. First Appalachian Corp.*, 494 F.2d 330, 332-333 (D.C. Ala. 1980).  *See, e.g.,* 10 Wright and Miller, *Federal Practice and Procedure*, §2727.

## LAW AND ARGUMENT

I.   **THERE IS NO TITLE VII CAUSE OF ACTION AGAINST INDIVIDUAL DEFENDANTS AND PLAINTIFF MAKES NO STATE LAW CLAIMS; PARKER IS DUE TO BE DISMISSED FROM THIS ACTION AS A MATTER OF LAW.**

"Title VII of the Civil Rights Act makes it an "unlawful employment practice" for an ***employer*** to "fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." *Cotton v. Cracker Barrell Old Country Store, Inc.*, 434 F.3d 1227 (11th Cir. 2006),  citing 42 U.S.C.

§ 2000e-2(a)(1).  "[ H]owever, it is well established in this circuit that a Title VII action will not lie against an individual employee." *Rossi v.  Troy State* University, 330 F.Supp.2d 1240, 1244.  *See Busby v.  City of Orlando,* 931 F.2d 764, 772 (11th Cir. 1991)("individual capacity suits under Title VII are…inappropriate."); *Cross v. State of Alabama Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1504 (11th Cir.1995).  The *Rossi* court further established that a suit against an individual acting in his official capacity is a suit against the entity which the individual represents.  *Id*.  And a claim for damages against an individual acting in his official capacity is a claim against the entity.  *Id.*

The introduction to Plaintiff's claim establishes that she brings this suit pursuant to Title VII,  42 U.S.C. § 2000e-2(a)(1).  Each of the three counts of Plaintiff's Complaint are based upon Title VII.  It has been clearly established that there is no cause of action against an individual under Title VII.  Furthermore, it has been established that a suit against an individual acting in his official capacity is a suit against the entity which that individual represents. Plaintiff's claims against Defendant Parker in his official capacity are subsumed by her claims against the entity which he represents, P&C, and there is no basis for liability against Parker.  Therefore, Defendant Parker is due to be dismissed as a matter of law from this action in its entirety and summary judgment is due to be granted in his favor.

## II.    PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS ARE DUE TO BE DISMISSED AS A MATTER OF LAW.

Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a *prima facie* case of unlawful discrimination by a preponderance of the evidence.  *Pate v. West Publishing Corp.,* 2006 WL 463543 (M.D. Ala), *citing McDonnell Douglas Corp.  v.  Green*, 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 2000). "If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action." *Id*, *citing Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). "The defendant has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced." *Id.*, *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-258, 101 S.Ct. 1980, 67 L.Ed.2d 207 (1981). Defendant need only produce, not prove, the nondiscriminatory reasons, the burden is "exceedingly light." See *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983); See also *Turner v. Amsouth Bank, N.A.,* 36 F.3d 1057, 1061) (11th Cir. 1994). "Once the defendant satisfies this burden of production, 'the presumption of discrimination is eliminated and the 'plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the real reasons for the adverse employment decision.'" *Id.*, *citing Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). "The plaintiff may meet this burden by persuading the court that a discriminatory reason more than likely motivated the defendant or by demonstrating that the proffered reason for the employment decision is not worthy of belief." *Id., citing Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-258, 101 S.Ct. 1980, 67 L.Ed.2d 207 (1981). If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered nondiscriminatory reasons, summary judgment should be granted. *Holifield v.Reno,* 115 F.3d 1555, 1565-66 (11th Cir. 1997).

Plaintiff has made bare allegations that her termination was based upon sexual or religious discrimination; however, Defendants have produced overwhelming evidence that the basis for Plaintiff's termination was her drinking problem, a fact which Plaintiff half-heartedly denies.

A.    **Plaintiff Cannot Establish A Claim For Religious Discrimination As She Was Clearly Not Subjected To A Religiously Hostile Work Environment And Defendant Had Wholly Independent Reasons For Her Termination.**

Whether plaintiff's work environment can be considered religiously hostile for purposes of Title VII requires the court's assessment of the totality of the circumstances, wherein the court should consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or mere offensive utterances, and whether it unreasonably interfered with plaintiff's work performance. *Tillery v. ATSI, Inc.,* 242 So.2d 1051 (N.D. Ala. 2003). The court has established where the plaintiff alleges she was fired because she did not share the religious beliefs of her employer, she "need only show that her perceived religious shortcomings played a motivating role in her discharge. *Id*. (citations omitted). The *Tillery* court adopted the elements enumerated by the 10th Circuit for establishing a *prima facie* case:

> (1) that [s]he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the **employee's job performance was satisfactory**; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

*Id*. at 1061, citing *Los Alamos National Laboratory*, 992 F.2d 1033, 1038 (10th Cir. 1993).

"As in any other discriminatory discharge case, plaintiff can establish that she was discharged on the basis of her religion, or lack thereof, with either direct or circumstantial evidence." *Id*. at 1058. The standard for proving discriminatory intent by direct evidence is a

stringent one, however, and only the most blatant comments will suffice. *Id., citing Earley v. Champion International Corp.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990). "The most obvious and compelling example of such evidence in the context of a case in which the plaintiff contends that she was discharged on the basis of her religion 'would be a remark to the effect that…I'm firing you because you're not a Christian.'" *Id.*, *citing Venters v. City of Delphi,* 123 F.3d 956, 972-73 (7th Cir. 1997). Here, Plaintiff has disclaimed any such direct evidence, "He didn't say he was going to terminate me for them reasons, no," so the analysis turns to whether she can establish her claim by circumstantial evidence. (Exhibit "A", p. 106).

"In the absence of direct evidence, plaintiff must rely upon circumstantial evidence and navigate the burden-shifting analysis first promulgated in *McDonnell.*" *Tillery* at 1059, *McDonnell Douglas Corp., supra.* However, it is important to note that in establishing pretext in Title VII religious discrimination action, Plaintiff is not allowed to recast employer's proffered non-religious based reasons for adverse action or substitute her business judgments for that of her employer. *Id.*

In the case *sub judice*, Plaintiff contends that she was fired because she did not share Defendant Parker's religious beliefs and did not attend church. However, Plaintiff admits that she and Parker did not have any discussions about her religious beliefs. Plaintiff claims, "he told me I needed to start going to church." (Exhibit "A", p. 107). However, she also admits that Parker did not tell her which church to attend, only that he made general statements to her that she needed to "get her life right with God." (Exhibit "A", p. 107). "He never told me he was going to terminate me." (Exhibit "A", p. 107). Plaintiff claims that she "did not need someone coming and talking to her…I mean, every time he came in the store, there was another conversation about

13

church." (Exhibit "A", p. 106). Plaintiff cites no direct evidence that Parker terminated her because she did not adhere to his religious beliefs. Therefore, we must look to the additional evidence presented to ascertain whether Plaintiff is able to make a *prima facie* case of discrimination.

It is undisputed that Plaintiff has suffered an adverse employment action by being terminated, thereby fulfilling element (1). However, Plaintiff cannot complete the requisite analysis as she is unable to establish that she was performing her job satisfactorily at the time of termination. It is undisputed that Plaintiff was well aware of the fact that her excessive drinking was causing her employer a great deal of concern and admits that he discussed the fact that her drinking was affecting her work on multiple occasions. (Exhibit "A", p. 107). Plaintiff also admits that it was only in the context of expressing his concern about her excessive drinking that Parker spoke to her about religion or encouraged her to go to church or "get her life right with God." Plaintiff does not dispute Parker's testimony regarding the fact that she oftentimes called another store clerk, Cindy Garret, as well as another store manager, Cindy Woolover, when she was under the influence of alcohol. Clearly, Plaintiff's job performance was unsatisfactory if a store customer felt it necessary to advise the store owner of her behavior and attitude. The mere fact that Parker encouraged her to seek counseling with a preacher or attend church will not establish her claim for religious discrimination especially in light of the fact that Plaintiff admits that she was made aware by Parker well in advance of her termination to change her ways.

"The court is not in the business of adjudging whether employment decisions are prudent or fair. Instead, the court's sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Pate v. West Publishing Corp.,* 2006 WL 463543 (M.D.

14

Ala), *citing Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999).   Plaintiff has not and cannot establish that Defendant Parker's basis for her termination is pretext because she freely admits that she did call at least one employee and one manager while she was under the influence of alcohol and cannot establish a *prima facie* case of religious discrimination based upon her unsatisfactory job performance.   For the foregoing reasons, Plaintiff's claim of religious discrimination is due to be dismissed as a matter of law and summary judgment is due to be granted in favor of the Defendant on the issue of religious discrimination.

### B.    Plaintiff's Claim Of Sexual Discrimination Fails As A Matter Of Law.

To establish a *prima facie* case of sexual discrimination, it is necessary that Gibbs prove that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment  action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003).   Plaintiff's claim of sexual discrimination fails as a matter of law due to the fact that she cannot establish element (4) because  she was replaced by someone *within* her protected group, *i.e.*, a female.

Although it is undisputed that Plaintiff suffered an adverse employment action, in that she was terminated, it is disputed that Plaintiffs' bare allegations of harassment were in any way related to said termination.   Additionally, Plaintiff is a white female and was replaced by another female.   Plaintiff can offer no evidence to suggest that she was replaced by a similarly situated employee who is outside of her protected class, nor can she present any evidence that she was treated less favorably than another similarly situated employee.   Plaintiff has named no other employee who engaged in the manner of disruptive intoxicated behavior in which she did.   If

15

anything, Plaintiff was given ample opportunity to remedy the situation prior to her termination. Plaintiff does not deny that Parker made her aware of his concerns on multiple occasions. She also admits that when she and Parker discussed her termination, he advised her that he would consider rehiring her if she got her life together and quit drinking. (Exhibit "A", p. 88).

Plaintiff's claim for sexual discrimination based upon her termination has no basis in law or fact and, as such, this claim is due to be dismissed as a matter of law and Defendants are due to have summary judgment granted in their favor.

### C.   Plaintiff's Claim For Sexual Harassment Fails As A Matter Of Law.

In order to establish a claim for sexual harassment under Title VII, the Supreme Court has determined that the plaintiff may rely on one of two theories, either that the harassment culminated in a tangible employment action against her or that the severe or pervasive conduct created a hostile work environment. *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006). As established by the Supreme Court, "tangible employment action" as established by Title VII of the Civil Rights Act is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing significant change in benefits -- action that results in direct economic harm. *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006). "There must also be a causal link between the tangible employment action and the sexual harassment." *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006), *citing Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1312 (11th Cir. 2001). However, any intervening acts may disrupt and thereby undermine the causal link between the harassment and tangible

16

employment action.  *Taylor v. CSX Transportation*, 2006 WL 544519 (M.D. Ala.), *citing*

*Gleason v. Mesirow Fin, Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997).

> **1.    Plaintiff's claim for sexual harassment under the first theory, tangible employment action fails as a matter of law.**

The *McDonnell Douglas* burden-shifting analysis requires the defendant to proffer a non-

discriminatory reason for the adverse employment action.  Plaintiff then has the heavy burden of

establishing that the reason offered is mere pretext.  However, in the instant matter, it is wholly

unnecessary to look beyond the initial production to determine whether Plaintiff must attempt to

establish a *prima facie* case of sexual harassment as Plaintiff has offered no evidence and cannot

produce sufficient evidence to prove that the reasons proffered by the Defendant for terminating

Plaintiff's employment are anything but legitimate.

Parker has testified that Plaintiff was terminated because her excessive drinking was having

a direct impact on her job performance.  He further testified that he was alerted to Plaintiff's

disruptive nature in an impromptu meeting called by two of her fellow employees and a store

customer.  Additionally, Parker has firsthand knowledge that Plaintiff's drinking was causing a

disturbance as he testified that Plaintiff called him at his home, at night, several times when she

was obviously under the influence of alcohol as evidenced by her slurred words and rambling

conversation.  It is undisputed that Carroll threatened to fire Plaintiff if Parker did not because he

too had enough of Plaintiff's late night, drunk phone calls to his home.  The impact Plaintiff's

alcohol abuse was having on the store is supported not only through the testimony of Parker, but

also by the affidavits of co-employees and other concerned parties which were presented to the

EEOC to rebut Plaintiff's charge.

Plaintiff has not attempted to dispute Parker's proffered reason for her termination. She admitted that Parker expressed his concerns about her drinking to her on multiple occasions. She admitted that he told her that the excessive drinking was affecting her work. She admitted that she called another store clerk daily when that clerk was working and Plaintiff was at home. She admitted that these conversations were sometimes lengthy and that sometimes she would initiate these conversations after she'd consumed alcohol. She further admitted that she called district manager Cindy Woolover at home from time to time and that there were times when she and Woolover spoke on the phone while Plaintiff was intoxicated. It is undisputed that Plaintiff was put on notice that her drinking was causing great concern among management, she chose to ignore Parker's expressions of concern. Plaintiff has not offered a scintilla of evidence to rebut the fact that Defendant's decision to terminate her was based upon anything unlawful, as such, summary judgment is due to be granted in favor of Defendants and Plaintiff's claim dismissed as a matter of law.

**2.    Plaintiff's claim for sexual harassment also fails under a hostile work environment theory.**

A Title VII hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct.367, 126 L.Ed.2d 295 (1993) quoting *Meritor Savings Bank, FSB v. Vinton,* 477 U.S. 57, 65, 67, 106 S.Ct.2399, 91 L.Ed.2d 49 (1986). In order to establish a hostile work environment based upon sexual harassment, in violation of Title VII, Gibbs must prove that (1) she belongs to a protected group; (2) she has been subject to

18

unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) harassment was based upon her sex; (4) harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding her employer liable. *Jackson v. Cintas Corp.,* 391 F.Supp.2d 1075, 1087 (M.D. Ala.2005), *citing Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999).

The foregoing analysis requires the court to consider Plaintiff's claims both subjectively and objectively. "The subjective component focuses on the employee's perception. The employee must perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* "Factors which can be considered are the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." *Rossi v. Troy State University*, 330 F.Supp.2d 1240, 1245 (M.D. Ala. 2002), citing *Rojas v. Florida,* 285 F.3d 1339, 1344 (11th Cir. 2002).

Plaintiff premises her claim that she was subjected to a hostile working environment on the fact that Parker rubbed her shoulders and back when he visited the store and that he once subjected her to harassing remarks. However, neither of these allegations, even when viewed in favor of Plaintiff, suffice to establish that she was forced to endure a truly hostile environment.

Plaintiff claims that Parker massaged her neck and shoulders every time he visited the store. She further claims that she indicated to him that she did not feel comfortable with him touching her and that she felt such touching was inappropriate. She makes no claim that Parker ever made any requests for sexual favors or that the "inappropriate touching," as she terms it, was

anything more than back rubbing. She also admits that when she "got ugly" with Parker and assertively told him that she did not feel comfortable with him touching her back that he desisted and did not do so again. Of course, Parker denies ever touching Plaintiff inappropriately or that he ever rubbed her back. However, when viewing this evidence in the light most favorable to Plaintiff, although she may have subjectively felt this behavior created a hostile environment, her perception is clearly unreasonable from an objective viewpoint. Plaintiff contends Parker rubbed her back, neck and shoulders. No reasonable person would interpret an occasional backrub or pat on the back as threatening, or humiliating. Plaintiff made absolutely no complaints about any of Parker's alleged behavior towards her until well after she was fired and, even now, she does not contend that Parker's behavior caused her any degree of humiliation, intimidation or prevented her from adequately performing her job.

Plaintiff also claims that Parker made one statement to her upon which she bases this assertion of a hostile work environment. Plaintiff claims that Parker made an inappropriate comment to her with respect to the fact that he was going to have to terminate an employee. She testified that Parker was upset about the fact that two of his employees were having an extra-marital affair with one another and visiting each other when either one was working at the store. Parker advised that he would not tolerate this behavior at the store and on company time. According to Plaintiff, when she advised Parker that the employee had resigned and turned his store keys in to her, he retorted with "you don't get your pussy where you get your paycheck." However, Plaintiff admits that she did not respond to this comment. She testified that she exhibited a shocked look on her face and that she said nothing. However, she admitted that this

was an isolated incident and she can think of no other instances of unwanted harassing remarks. (Exhibit "A", p. 95).

Once again, there is nothing to indicate that this remark was in any way related to Plaintiff's sex, that it was physically threatening, humiliating, pervasive or severe. Plaintiff agrees, this was one isolated comment. And although Defendant Parker denies making this comment, for purposes of considering this argument in the light most favorable to Plaintiff, even if this statement were made by Parker in the exact manner claimed by Plaintiff, it would not suffice to establish a hostile working environment. There is nothing to suggest this comment was in any way related to the fact that Plaintiff is a female; rather, it would suggest it was more of an outburst to his store manager. There is nothing to suggest that Plaintiff was humiliated. She admits that her only reaction to this comment was "shocked." This does not establish a hostile work environment. There are many things which may be shocking, but that does not render them sufficiently severe to alter the terms of her working environment.

Plaintiff points to two complaints upon which she bases her claim that she was subjected to a hostile work environment -- the unwanted touching and Parker's lone comment. Neither of these rise to the level of severity required to establish what a reasonable person would consider discriminatorily abusive. Plaintiff has failed to and cannot establish that she was subjected to hostile work environment sexual harassment; accordingly, this claim is due to be dismissed as a matter of law and summary judgment is due to be entered in favor of Defendants.

III.   **PLAINTIFF CANNOT ESTABLISH A CLAIM FOR RETALIATION BECAUSE, BY HER OWN ADMISSION, SHE DID NOT ENGAGE IN ANY PROTECTED CONDUCT.**

"Title VII prohibits an employer from retaliating against an employee for enforcing her rights under the act." *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 (M.D. Ala), *citing Cotton v. Cracker Barrell Old Country Store, Inc.,* 434 F.3d 1227, 1233 (11th Cir. 2006). "Title VII prohibits retaliatory action against an employee 'because he has opposed any practice made an unlawful employment practice by this [title]; or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]." *Id.*, citing 42 USC § 2000e-3(a). "This provision has two components, an opposition clause and a participation clause." *Id*. The opposition clause requires a plaintiff to (1) oppose an employment practice and (2) have a good faith, reasonable belief that the practice opposed is unlawful. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). "To establish a *prima facie* case of retaliation,…a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; (3) the adverse action was causally related to the protected expression." *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 (M.D. Ala), *citing Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir. 1998). Once plaintiff has established adequate evidence to create this inference, it is her responsibility to further demonstrate a causal connection between the statutorily protected speech and the employment action. *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 at 7 (M.D. Ala), *citing Shannon v. Bellsouth Telecommunications Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). "This element is satisfied where the plaintiff provides 'sufficient evidence that the decision-maker became aware of this protected conduct, and that there was close temporal

proximity between this awareness and the adverse employment action." *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 at 7 (M.D. Ala), *citing Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir. 1997).

Plaintiff has not engaged in any activity which would fall under the protection of this act. She did not oppose any unlawful employment practice nor did she participate in anything pertaining to an unlawful employment practice.[2]    By Plaintiff's own admission, she never informed anyone at P&C of the allegations upon which she bases this complaint.  Nonetheless, assuming *arguendo* that Plaintiff is alleging she was terminated because she told Parker, in an ugly tone, not to touch her, she cannot present sufficient evidence in support of this theory and the temporal proximity alone is far too tenuous to create an inference of retaliation.

Plaintiff alleges that the final incident wherein she "got ugly" when she told Parker to stop touching her occurred  sometime after the manager's meeting, which was approximately one month prior to her termination.  She claims she'd told Parker to stop touching her many times prior to this; however, on this one occasion, she got real ugly and she was blunt, "I told him, Mr. Parker, stop."    However, Plaintiff admits that Parker simply walked away and he stopped touching her.  When asked how Parker reacted to her statement, Plaintiff replied, "He didn't react... either he or [she] walked away."  (Exhibit "A", p. 82).  Plaintiff also admitted that she cannot recall another instance of Parker touching her after that day, which was several weeks prior to her termination.  (Exhibit "A", p. 83).  There is no causal connection between Plaintiff's

---

[2]Although Plaintiff did file a claim with the Equal Employment Opportunity Commission, which would constitute protected speech, said claim was not filed until after she was terminated, which negates any possibility that her termination could be based thereupon.

23

purported resistance to Parker and her termination.  This one singular incident which occurred a few weeks prior to her termination cannot establish an inference that her termination was based upon her telling Parker not to touch her, especially in light of the fact that Carroll, who knew absolutely nothing about Plaintiff's claims of alleged harassment, had stated to Parker that he intended to fire Plaintiff if Parker did not.

There is absolutely no evidence to suggest that either of the two other shareholders, anyone in any level of management or any co-employee for that matter, had any knowledge whatsoever about Plaintiff's claims.  Plaintiff admits that she did not report Parker's alleged inappropriate touching to anyone.  She claims that she did not know who she could report his behavior to and that she did not see where it would be worthwhile since he is an owner of the company.  However, Plaintiff also admits that she has known Carroll and Cindy Woolover for years.  Carroll is a co-owner of the company and formerly served as Plaintiff's district manager.   She further testified that she has called Cindy Woolover at home to discuss other issues about the store.  She admitted that she had discussed the situation wherein two store employees were having an affair with Cindy Woolover.  She admitted that both Cindy Woolover (district manager) and Carroll (co-owner, district manager) both visited the store on occasion.  However, Plaintiff made no mention of any of the allegations which form the basis of her current complaint.

Plaintiff alleges that Parker's inappropriate touching began as soon as P&C took over the store.  She claims that this behavior occurred every time Parker visited the store.  Yet, Plaintiff admits that she attended a manager's meeting approximately one month before she was terminated (well over five months after Parker's alleged touching began), and that every store owner as well as every store manager was in attendance at this meeting.  Most importantly, Plaintiff concedes

that the very issue of sexual harassment and the fact that P&C would not tolerate it was discussed at this meeting.  P&C's Employee Handbook was reviewed and the attendees were not only advised of P&C's harassment and reporting policy, but also given a copy of the handbook to maintain at the store premises.  Despite having had this policy explained to her, and having read and explained it to her own employees, Plaintiff told no one of this alleged harassment to which she was being subjected.  Despite knowing other managers personally, to the point where she could and would call them at home after hours, Plaintiff called no one.  Plaintiff did not complain about anything pertaining to her employment to anyone involved in P&C at any point.  It was not until well after her termination that she felt compelled to voice these allegations for the first time.

Plaintiff engaged in no speech.  She alerted no one to the alleged harassment she was experiencing.  There can be no retaliation when there is nothing upon which to base it.  Plaintiff cannot establish anything which would entitle her to protection under Title VII for retaliatory discharge and, as such, Plaintiff's claims for sexual and religious retaliation are due to be dismissed as a matter of law and Defendants are entitled to have summary judgment granted in their favor.

Based on the foregoing, Defendants P&C Grocers and Charles Parker respectfully request the Court to enter summary judgment in their favor as to all counts of Plaintiff's Complaint.

**RESPECTFULLY SUBMITTED,** this the 13th day of April,  2006.

 /s/ Micheal S. Jackson
**MICHEAL S. JACKSON [JACKM8173]**
Attorney for Defendants Charles Parker and
P&C Grocers, Inc.

25

**OF COUNSEL:**

BEERS, ANDERSON, JACKSON,
   PATTY & VAN HEEST, P.C.
P. O. Box 1988
Montgomery, AL 36102
(334) 834-5311
(334) 834-5362 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 13th day of April, 2006, I electronically filed DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Blakeney, Esq.
P. O. Box 100
Geneva, AL 36340

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

/s/ Micheal S. Jackson
**OF COUNSEL**