IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

**COPY**

CECELIA GIBBS,                    )

     Plaintiff,                   )

VS.                              ) CASE NO. 1:05-CV-912-T

P&C GROCERS, INC., and           )

CHARLES PARKER,                  )

individually, and as an          )

agent for P&C GROCERS,           )

INC.,                            )

     Defendants.                  )

The deposition of CECELIA GIBBS, taken
pursuant to Federal Rules of Civil Procedure
before Lisa M. Bryan, Court Reporter and Notary
Public, State at Large, at the Law Offices of
Charles W. Blakeney, 201 North Commerce Street,
Geneva, Alabama, on the 20th day of February,
2006, at approximately 10:00 a.m., pursuant to
notice.

PLAINTIFF'S
EXHIBIT
A
Blumberg No. 5113

2

1    <u>APPEARANCES</u>

2

3    FOR THE PLAINTIFF:

4         Honorable Charles W. Blakeney, 201 North

5    Commerce Street, Geneva, Alabama 36340.

6

7    FOR THE DEFENDANTS:

8         Honorable Michael S. Jackson, Beers,

9    Anderson, Jackson, Patty & Van Heest, P.C., Post

10   Office Box 1988, Montgomery, Alabama 36102.

11

12   ALSO PRESENT:

13        Charles Parker.

14

15

16

17

18

19

20

21

22

23

### STIPULATION

It is stipulated by and between Counsel for the parties that this deposition be taken at this time by Lisa M. Bryan, Court Reporter and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition be taken down stenographically, transcribed and certified by the commissioner.

Except for objections as to the form of the questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection, then and there assigned.

The witness wishes to read and sign.

1    Q.    Okay.  We are here -- of course, I am

2    here to take your deposition concerning the

3    allegations you're making against Charles Parker

4    and P&C Grocers.  You, at one time, were the

5    manager of a convenience store; is that correct?

6    A.    Yes.

7    Q.    That P&C Grocers first leased and then

8    purchased?

9    A.    Yes.

10   Q.    All right.  Now, you were working at

11   that store when P&C Grocers entered into the

12   lease to operate that store; is that correct?

13   A.    Yes, but I was told that they bought it

14   out right.

15   Q.    Okay.

16   A.    So --

17   Q.    And who -- at the time, before P&C

18   Grocers started operating the store, who was the

19   owner and operator of that store?

20   A.    Sam Carroll.

21   Q.    Individually or did he have a company?

22   A.    I don't know.  He just had -- I just

23   know he had a bunch of stores.

48

1    A.    No.

2    Q.    And you never did it in response to any

3    situation at the stores about sexual harassment

4    or discrimination?

5    A.    No.  We really didn't have -- we didn't

6    have a book or a manual.  I mean, that was there.

7    I mean, but it was just there.

8    Q.    All right.  Now, when Mr. -- and you may

9    have already answered this.  I'm not meaning to

10   be repetitive if you think that this is

11   repetitive.  But when Mr. Carroll owned and

12   operated the GOCO Liberty stores --

13   A.    Uh-huh.

14   Q.    -- did he ever have any kind of group

15   meeting or one on one meeting with you to go over

16   his policy and procedure regarding sexual

17   harassment or discrimination?

18   A.    Not that I remember.

19   Q.    All right.  You already told me that Mr.

20   Parker would come to the store once or twice a

21   week acting as the district manager to check on

22   things at the store.  You've also told me about

23   one group meeting at the state park in Florala.

1    really have to provide details.  That's the

2    purpose of a deposition like this is to kind of

3    get the details.  Okay?

4         A.    Okay.

5         Q.    For example, you've got in here that

6    defendant Charles Parker subjected you to

7    unwanted, inappropriate and harassing remarks and

8    touching.  Defendant, Charles Parker, rubbed the

9    plaintiff's shoulders in a sexually suggestive

10   way.  Okay?  So I want to ask details about that.

11   When you put in your complaint, and you make the

12   statement that Mr. Parker subjected you to

13   unwanted, inappropriate and harassing remarks and

14   touching, I want to deal with those separately.

15   Okay?

16        A.    Okay.

17        Q.    I want you to tell me in your own words

18   when was the first occasion that that kind of

19   conduct occurred.

20        A.    Mr. Parker never came in the store

21   without touching and rubbing your shoulders.

22        Q.    Okay.  So your testimony would be that

23   every time he came into the store, he would touch

65

1  you or rub your shoulders?

2      A.    Yes.

3      Q.    And that started from the first time Mr.

4  Parker came to the store?

5      A.    The first time Mr. Parker ever came into

6  the store.

7      Q.    All right.  So when he came in with his,

8  I think you called it inventory team, to take

9  inventory and introduce himself as the new owner,

10  on that occasion, is it your testimony that Mr.

11  Parker touched you inappropriately?

12      A.    I don't know.  I can't say that because

13  I'm not for sure, because I don't remember -- we

14  had so much going on at that point.

15      Q.    So you're not sure about that, but then

16  from that point, whenever he would come by

17  himself to check on the store, acting as district

18  manager, you're saying every time he would touch

19  you inappropriately?

20      A.    And he would be rubbing on your

21  shoulders.

22      Q.    Explain that to me when you say he

23  rubbed on your shoulders.

1     A.    In other words, he would get right back

2   behind you and start massaging you and rubbing on

3   your neck and your arms.

4     Q.    Now, where would you be located when

5   this happened?

6     A.    Normally sitting there doing paperwork

7   or at the end of the counter.

8     Q.    Now, the way the store was configured or

9   set up, you had a store area that had the goods

10  out beyond the counter for customers to come in

11  and to shop and to get their goods, and then

12  bring them up to the counter to pay for them; is

13  that right?

14    A.    I am not --

15    Q.    I mean, you just had a store area with

16  shelves and --

17    A.    Oh, yes.

18    Q.    -- inventory?

19    A.    Yes.

20    Q.    Did these stores also have gas?

21    A.    Yes, sometimes.

22    Q.    Now, what then separated -- you know,

23  from the store area where customers were, what

1    sexually suggestive way.  What are you talking

2    about?

3        A.   Mr. Parker was asked not to put his

4    hands on me, but Mr. Parker continued it anyway.

5        Q.   Well, that's a different answer than

6    what I'm asking you right now.  It says, Rubbed

7    the plaintiff's shoulders in a sexually

8    suggestive way.  What are you talking about when

9    you say a sexually suggestive way?

10       A.   I don't like anybody touching me, and I

11   don't think rubbing a person's shoulders and

12   going down into their neck area is -- I don't

13   think it's appropriate.  I'm just sorry.

14       Q.   All right.

15       A.   It's not appropriate.

16       Q.   All right.  And you are saying that

17   without exception over time that Mr. Parker came

18   to the store alone, and you were there, that he

19   would do this?

20       A.   When I was alone?

21       Q.   No.  When he came to the store alone and

22   you were there, he would do this?

23       A.   Yes.  Mr. Parker always came in

77

1   A.   Right.

2   Q.   Well, did you take that as a sexual

3   overture when he took you by your arms and sat

4   you on the milk crate, or was that in connection

5   with this over ring situation with Donnie?

6   A.   Well, he was basically either accusing

7   me or Donnie of stealing, and that's all there

8   was to it.  And no, he would just be very

9   aggressive --

10   Q.   All right.

11   A.   -- and mean.

12   Q.   All right.  Is there any other way

13   besides what you have already told me about that

14   Mr. Parker touched you?

15   A.   No.

16   Q.   All right.  Now, you made a statement in

17   response to another question I asked you that is

18   not really the answer to my question.  You said

19   that Mr. Parker was told to leave you alone and

20   he didn't.  Tell me about that.

21   A.   Mr. Parker started rubbing my shoulders.

22   I said, Mr. Parker, don't be touching me, I don't

23   like it.  It wasn't very much longer I ended up

1    fired.

2        Q.   When you say not very much longer, how

3    much longer?

4        A.   I believe it was all in the same month.

5    I am not sure.  It was just within a few weeks of

6    that period of time.

7        Q.   Well, now, you have already told me that

8    the group meeting at the state park in Florala

9    was about a month before you were terminated.

10       A.   Right.

11       Q.   And now you're saying that this was

12   within a few weeks of you being terminated.  So

13   are you saying that you told Mr. Parker don't be

14   touching me after the group meeting --

15       A.   Right.

16       Q.   -- at the state park?

17       A.   Right.

18       Q.   So the conduct that you're talking about

19   started after the group meeting at the state

20   park?

21       A.   No.  Mr. Parker always done that.

22       Q.   All right.

23       A.   I mean, the whole time he has owned the

1 | store.

2 | Q.   Okay.  All right.  Your testimony is

3 | that following that group meeting is the occasion

4 | that you told Mr. Parker not to be touching you

5 | because you didn't like it?

6 | A.   I told Mr. Parker that several times.

7 | Q.   Well --

8 | A.   But that time --

9 | Q.   -- I hear what you're saying, but when

10 | you first said that you said that not very much

11 | longer I was fired, and that was within a few

12 | weeks --

13 | A.   Yes, that's when I really got kind of

14 | hasty about it and I told him to keep his hands

15 | to himself.

16 | Q.   Well, based upon your testimony then,

17 | the inference is that from the beginning that P&C

18 | Grocers took over January of 2004, from the very

19 | first time Mr. Parker came into that store alone,

20 | that he started touching you and that you did not

21 | tell him not to touch you until after the group

22 | meeting at the state park in Florala.  That's

23 | what you have basically told me.

1    A.    I told him that several times, but I got

2  real ugly that time.

3    Q.    All right.  When you say you got real

4  ugly, you said that you told Mr. Parker, Don't be

5  touching me, I don't like it.  So how did you get

6  real ugly?

7    A.    Because I was just real blunt about it.

8  I mean, before, I told him, Mr. Parker, stop.

9  That time, I was really blunt.

10    Q.    And how did Mr. Parker react when you

11  were ugly and told him not to touch you, that you

12  didn't like it?

13    A.    He just walked away.

14    Q.    So he stopped touching you at that point

15  and walked away?

16    A.    At that point.

17    Q.    And then when he came back in the store,

18  did he repeat the conduct?

19    A.    Yes, he did.

20

21            MR. JACKSON:  Do you need to take a

22        break (indicating to Mr. Blakeney)?

23            MR. BLAKENEY:  Yes.

1      A.    Right.

2      Q.    All right.  And then your understanding

3   is that Mr. Parker then called you, you were at

4   your house and he was at the store?

5      A.    Right.  Mr. Parker was at the store.

6      Q.    And tell me about that conversation.

7      A.    He basically told me that I needed to

8   get my life right with God.  I needed to quit

9   drinking.  And when I did those things, to call

10  him back and he may put me back to work, but for

11  now he was letting me go.

12     Q.    All right.  Now, before I move on to

13  religion, I want to make sure I give you an

14  opportunity to tell me -- and you may have --

15  everything about the sexual harassment in the way

16  of touching you.  Have you told me everything

17  about that?

18     A.    Pretty much of what I can remember.

19     Q.    Now, you've also got in the complaint

20  harassing remarks.  That would be obviously

21  words, comments that Mr. Parker subjected you to,

22  unwanted, inappropriate harassing remarks.  What

23  do you mean by that?

1  like that?  Did you ever have any discussion with

2  him like that?

3     A.   Just the same conversation me and Mr.

4  Parker had all the time, you need to be in

5  church.  He wanted me to go to church.  I needed

6  to pray.  I needed to do this.

7     Q.   Did you ever sit down and have a

8  one-on-one meeting with Mr. Parker where he asked

9  you what it is that you believed in, what your

10 religious practice was?

11    A.   Mr. Parker asked me if I believed in

12 God.

13    Q.   Okay.  All right.

14    A.   But I also believe everybody believes in

15 their own ways.

16    Q.   I asked you whether Mr. Parker ever told

17 you that unless you stopped doing some religious

18 activity he was going to terminate you, and you

19 said no.  Now, I'm going to ask the opposite.

20 Did Mr. Parker ever tell you that unless you

21 started doing some particular religious activity

22 that he was going to terminate you?

23    A.   He didn't say he was going to terminate

1  church, you need to get your life right with God,

2  did it have anything to do with your drinking?

3      A.   Yes.  Mr. Parker complained about me

4  drinking, yes.

5      Q.   Okay.  And during the period of time,

6  the six months that you were working at P&C

7  Grocers, did you have a problem with drinking?

8      A.   I drank.

9      Q.   Well, did you ever have --

10     A.   I'm not going to say no, I don't --

11     Q.   Did you have any problem with it?

12     A.   No, I don't believe so.

13     Q.   All right.  You drank, but you say you

14  didn't have a problem with it?

15     A.   I don't believe so.

16     Q.   All right.  Did you ever drink on the

17  job?

18     A.   No.

19     Q.   Did you ever call people at work while

20  they were working and you were at home after you

21  had been drinking?

22     A.   I'm sure I did call them to tell them to

23  do something or they'd call me for something.

1    at the store?

2        A.    No.  Cindy didn't work at a store, but

3    she was on call always.

4        Q.    Okay.  All right.  Now, how about Evelyn

5    Husbands?  Have you read her statement?

6        A.    I sure did.

7        Q.    She's the lady that sells Avon?

8        A.    That's Cindy's mom.

9        Q.    You read her statement?

10        A.    I sure did.

11        Q.    Where she said she came into the store

12    and she saw you drinking out of a bottle

13    underneath the counter?

14        A.    Not true.

15        Q.    Did you see the statement?

16        A.    Yes.

17        Q.    Do you deny it?

18        A.    Yes.

19        Q.    Okay.  Did you see in her statement

20    where she said you took money out of the cash

21    register to pay for Avon products?

22        A.    Yes, I seen it.

23        Q.    Is that true?

1     Q.   Have you taken a minute to --

2     A.   I believe so.

3     Q.   -- allow you to think if there is any

4  other instances where Mr. Parker discriminated

5  against you because of your religious beliefs?

6  And you've told me about them all?

7     A.   I believe so.

8     Q.   Now, in response to Mr. Parker making

9  statements to you that you need to start going to

10  church or you need to get your life right with

11  God, what, if anything, did you tell Mr. Parker?

12     A.   My life with God was none of his

13  business.

14     Q.   Okay.

15     A.   I mean, that doesn't have anything to do

16  with the store.

17     Q.   And then what did Mr. Parker say in

18  response to that?

19     A.   He just shook his head and would tell me

20  I need to get right with God.

21     Q.   Okay.  Now, after Mr. Parker made

22  statements like this to you -- and from what

23  you're testifying to, he did this on more than

164

1    Q.    -- touching by Mr. Parker to any other
2    P&C Grocer employee?

3    A.    No.

4    Q.    You already told me that you deny ever
5    asking Mr. Parker for any recommendations or any
6    help for your drinking problem.  You deny that,
7    right?

8    A.    Right.

9    Q.    So I take it then you'd also deny, that
10   in response to you asking Mr. Parker for help,
11   him telling you or asking you why don't you see
12   your pastor.  Did Mr. Parker ever say that in
13   response to you asking him for help for drinking?

14   A.    He never asked and I never asked, and
15   no, that's never been a conversation.

16   Q.    Where were you born and raised through
17   high school?

18   A.    I was born in Texas, raised in Ohio.

19   Q.    How did you get to Alabama or --

20   A.    Uh --

21   Q.    Yes, go ahead.

22   A.    I used to live in Lakeland, Florida, and
23   the fellow that I was seeing brought me up here.

1    A.   In my whole entire life?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And during those times during your

5    entire life that you are talking about that you

6    admit to being drunk, were you at the store?

7    A.   Never.

8    Q.   Were you ever drinking at the store?

9    A.   Never.

10   Q.   Okay.  When you were actually drunk,

11   making a distinction between drinking and drunk,

12   did you call the store -- well, let's say ever?

13   A.   Drunk?

14   Q.   Drunk.

15   A.   I probably talked to Cindy once or twice

16   at the store when I was drunk.

17   Q.   Okay.  And other times you would call

18   and be drinking?

19   A.   I'd have a drink.

20   Q.   Now, you heard some detailed questioning

21   about the statements that people made relating to

22   what you did and didn't do --

23   A.   Yes.

1       Q.   -- at various stores?  Were the majority

2   of those statements about things that happened

3   outside of the time of ownership by P&C Grocers?

4       A.   Explain that again.

5       Q.   Okay.  In other words, were all of those

6   statements about things that happened in the

7   six-month period when you were at P&C Grocers as

8   opposed to Liberty or somebody else?

9       A.   It's between several different owners.

10      Q.   And, of course, I'm obviously only

11  asking you about those details that you admit

12  happened.

13      A.   Yes.  It's been several different

14  owners.

15      Q.   And that's over many different owners?

16      A.   Yes.

17      Q.   Okay.  Were you ever reprimanded in

18  writing for things coming up missing --

19      A.   No.

20      Q.   -- from the store?  On any of these, no

21  matter who was the owner?

22      A.   No.

23      Q.   Were you ever reprimanded in writing for

1    anything relating to alcohol, drinking on the

2    job?

3        A.    No.

4        Q.    Not just with P&C Grocers.

5        A.    Never.

6        Q.    Never?

7        A.    No.

8        Q.    Were you ever told any of the things

9    that are summarized in those statements prior to

10   your termination at P&C Grocers?

11       A.    What do you mean?

12       Q.    In other words, did you -- were you ever

13   told any of the details of those statements --

14       A.    No.

15       Q.    -- before you were fired?

16       A.    No.

17       Q.    Okay.  In your opinion, when were those

18   statements gathered?

19       A.    After Mr. Parker fired me and I did what

20   I did.

21       Q.    And when you say you did what you did,

22   what do you mean by that?

23       A.    I came and seen you and filed for my

STATE OF ALABAMA,

GENEVA COUNTY.

  I, Lisa M. Bryan, Court Reporter and Notary Public, State at Large, do hereby certify that the foregoing transcript, pages 1 through 202 is a true and correct transcript of the testimony, to the best of my ability and understanding; and that the same was taken down by me in stenographic shorthand, recorded electronically, and transcribed by me personally or under my direct supervision.

  I further certify that I have no interest in this matter, financial or otherwise, or how it may develop or what its outcome may be. I further certify that I am not of counsel for any of the parties, nor am I related to counsel or litigants or associated with anyone connected with this cause to my knowledge.

  WITNESS my hand this the 20th day of March, 2006.

_____
Lisa M. Bryan
My Commission Expires 12/09/09