1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3           SOUTHERN DIVISION

4                          **COPY**

5  CECELIA GIBBS,           )

6       Plaintiff,      )

7  VS.                 )  CASE NO. 1:05-CV-912-T

8  P&C GROCERS, INC., and  )

9  CHARLES PARKER,      )

10  individually, and as an  )

11  agent for P&C GROCERS,  )

12  INC.,               )

13       Defendants.     )

14

15

16        The deposition of CHARLES PARKER, taken

17  pursuant to Federal Rules of Civil Procedure

18  before Lisa M. Bryan, Court Reporter and Notary

19  Public, State at Large, at the Law Offices of

20  Charles W. Blakeney, 201 North Commerce Street,

21  Geneva, Alabama, on the 20th day of February,

22  2006, at approximately 2:00 p.m., pursuant to

23  notice.

PLAINTIFF'S
EXHIBIT
B
Blumberg No. 5113

1            APPEARANCES

2

3    FOR THE PLAINTIFF:

4            Honorable Charles W. Blakeney, 201 North

5    Commerce Street, Geneva, Alabama 36340.

6

7    FOR THE DEFENDANTS:

8            Honorable Michael S. Jackson, Beers,

9    Anderson, Jackson, Patty & Van Heest, P.C., Post

10   Office Box 1988, Montgomery, Alabama 36102.

11

12   ALSO PRESENT:

13            Cecelia Gibbs.

14

15

16

17

18

19

20

21

22

23

## STIPULATION

It is stipulated by and between Counsel for the parties that this deposition be taken at this time by Lisa M. Bryan, Court Reporter and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition be taken down stenographically, transcribed and certified by the commissioner.

Except for objections as to the form of the questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection, then and there assigned.

The witness wishes to read and sign.

1    Q.   75 or 80 miles.  Okay.

2    A.   It's in south Montgomery County.

3    Q.   And where would you consider that you

4    work?

5    A.   I don't work now.

6    Q.   You don't work now.  Do you consider

7    yourself retired?

8    A.   Yes, sir.

9    Q.   At one time you were working by managing

10   grocery stores?

11   A.   Yes, sir.

12   Q.   7/11 type, Hobo Pantry type stores?

13   A.   Yes, sir.

14   Q.   How many stores did you own?

15   A.   Nine.

16   Q.   Nine stores?

17   A.   Yes, sir.

18   Q.   And was it during the time period after

19   January 5th of '04?

20   A.   Yes, sir.

21   Q.   And where were those stores located

22   mostly?

23   A.   Six in south Alabama and three in north

1  Florida.

2      Q.   Okay.  And did you own them through an

3  entity called P&C Grocers?

4      A.   Yes, sir.

5      Q.   Is that incorporated?

6      A.   Yes, sir.

7      Q.   And what's the full name of P&C Grocers,

8  if it's different from what I have?

9      A.   It's not different.  It's -- that's the

10  full name.

11      Q.   Okay.  And when --

12      A.   P&C Grocers, Inc.

13      Q.   And when did you incorporate?

14      A.   I believe it was January, between the

15  1st and the 5th of '04.

16      Q.   And who was the president of the

17  corporation?

18      A.   I was.

19      Q.   Okay.  And were there any other

20  officers?

21      A.   Yes, sir.

22      Q.   Who were the other officers?

23      A.   Mr. Bryan Leebo was vice president and

1     Q.   Did you tell CC that she needed to

2   report to you, that you were her boss and that

3   she needed to report to you?

4     A.   No, sir.

5     Q.   You didn't?

6     A.   I assume that she knew that.

7     Q.   Okay.

8     A.   Initially, I believe CC reported to

9   Cindy, who was a supervisor or a district

10  manager.

11     Q.   And do you also agree that she later

12  became the one that ran the Florida stores --

13     A.   We leased some additional stores in

14  Florida, and she took on that responsibility.

15  And I took on the Alabama stores.

16     Q.   Approximately, as best you remember,

17  when you leased these other stores, what did the

18  total number of stores get to be?

19     A.   The most we had was 20.

20     Q.   20 stores?

21     A.   Yes, sir.  19 -- I'm sorry -- at one

22  time.

23     Q.   19.  And you said there were six in

1    A.    I don't.  I believe that was in May, but

2    I'm not sure.  April or May.

3    Q.    Could you provide me with any handouts

4    that were handed out at that meeting?

5    A.    I will try.  I don't have them with me,

6    no, sir.

7    Q.    That --

8    A.    Hopefully they have something at the

9    office.

10    Q.    Through your attorney, I mean.  Is it

11    your position that this meeting happened prior to

12    your decision to terminate CC?

13    A.    Yes, sir.

14    Q.    Okay.  Do you have any write-ups

15    relating to CC's performance?

16    A.    No, sir.

17    Q.    Did you accomplish or memorialize any

18    write-ups relating to CC's performance?

19    A.    No, sir.

20    Q.    What is your position relating to why

21    you terminated CC's employment?

22    A.    Her drinking problems, calling me at

23    night, 9:00, 10:00, 11:00 at night.  Sometimes

1    I'd be asleep and my wife would talk to her.  If

2    I was at the store real early in the morning, you

3    could smell alcohol on CC's breath bad a lot of

4    mornings.  I didn't say every morning.  I said a

5    lot of mornings.  And that's why I talked to her

6    about her drinking problem, because if it could

7    be smelled on her in the store, then it was a

8    problem to me.

9         Q.   How close did you get to her to be able

10   to smell her?

11        A.   You didn't have to get too close.

12        Q.   Not too close?

13        A.   No, sir.

14        Q.   And do you have any kind of training in

15   detecting whether somebody may be intoxicated or

16   whether somebody may be drinking, other than just

17   our normal life experiences?

18        A.   Nothing except my experience, but I've

19   been in management all of my life, so -- all of

20   my working life.

21        Q.   Okay.  Do you run into that a lot?

22        A.   No, sir.  No, sir.  The problems you run

23   into are not something you can smell.

1    Q.    Okay.  Any other problems that you think

2    related to your decision to terminate CC?

3    A.    No.

4    Q.    So drinking, calling you at 9:00, 10:00,

5    11:00 at night, smelling alcohol on her breath in

6    the mornings, and you didn't have to get too

7    close to her to do that?

8    A.    No, sir.  And the calling me at night

9    was not a problem.  It's calling me at night when

10   she would go on and on and on, slurring her

11   words.  And I'd be in bed and my wife would be

12   laying there, and she'd say that's got to be CC

13   because you haven't said anything.  You're just

14   listening.

15   Q.    And how often did you come to her store?

16   A.    Anywhere from one to three or four times

17   a week, depending on what I was doing in another

18   store.

19   Q.    And about how many times percentagewise

20   would you say you smelled alcohol on her?

21   A.    Oh, Mr. Blakeney, I couldn't tell you.

22   Several times.

23   Q.    Your estimate?

1    the time I'd smell alcohol on CC's breath.

2        Q.    And so more than 50 percent of the time

3    mostly?

4        A.    If I was there real early, yes, sir.

5        Q.    And you did not -- I'm assuming these

6    times are scattered throughout the whole time

7    that she was employed by you?

8        A.    Yes, sir, but I'd say the last two

9    months it was worse than it was before.

10       Q.    Okay.  And you never chose to reprimand

11   her in any way --

12       A.    Not anything --

13       Q.    -- related to alcohol?

14       A.    -- except I talked to her.

15       Q.    You just talked to her?

16       A.    I talked to her.

17       Q.    Okay.  Now, you've got several

18   depositions (sic) from a lot of different people

19   relating to both the alcohol and taking things

20   from the store and, in fact, taking money from

21   the store.

22       A.    Yes, sir.

23       Q.    Okay.  Were you aware of any of these

problems, other than the smell of alcohol, prior to your termination of CC?

A.    No, sir.

Q.    So all of these statements that were gotten, were gotten after she was terminated?

A.    Yes, sir.

Q.    And, in fact, were gotten after this lawsuit was instituted; isn't that correct?

A.    I think a couple of them may have been before then.

Q.    Which couple?

A.    I do not know. I'd have to look at the things and look at the dates.

Q.    Okay.

A.    It was -- the lady that was running the store had told me that she understood CC was suing me. And I said, Well, I don't know anything about it. And she said, Well, if you need any help, I certainly -- there have been a lot of people made comments, and if you need any help if she sues you, let me know. And I said, Well, the first notice I got, there wasn't a suit, it was an EEOC charge.

1   characterized as a serious drinking problem?

2        A.    Yes, sir.

3        Q.    Over this six-month period of time?

4        A.    Yes, sir.

5        Q.    And you didn't do anything about that?

6        A.    No, sir.  It became progressively worse,

7   though.

8        Q.    Okay.  Well, when CC lost her job, she

9   applied for unemployment compensation?

10       A.    Yes, sir.

11       Q.    Did you tell the unemployment

12  compensation folks that the reason you fired her

13  was because of her drinking?

14       A.    No, sir.  My son was running the office,

15  and he and Trot Carroll stayed there, and they

16  asked me what we wanted to do when we got

17  notification CC had filed for unemployment.  And

18  I said nothing, because she needs something until

19  she can get a job.

20       Q.    Okay.

21       A.    I wouldn't fight it.

22       Q.    So you didn't respond at all?

23       A.    No, sir.

1    A.    Yes, sir.  As a group, yes, sir.

2    Q.    Well, how about individually?

3    A.    As I told you a while ago, we discussed

4    all of the policies and things to do, not to do

5    with all of the people with all of the stores.

6    Q.    Did you log any of that discussion in

7    any way?

8    A.    Just meeting and talking with them as I

9    visited stores.

10    Q.    Okay.  And you were talking about how to

11    dress, how to groom, how to relate to the public

12    and all of those kinds of things, correct?

13    A.    Yes, sir.

14    Q.    Can you testify from your personal

15    knowledge and memory that you know that you went

16    over sexual harassment and discrimination

17    policies with all of your management employees

18    within a short time after you acquired the

19    stores?

20    A.    No, sir.

21    Q.    Can you assert from your memory that you

22    did that specifically with CC?

23    A.    No, sir.

1    Q.    Could she have been short about other

2  things?

3    A.    Sure.

4    Q.    Could she have been nervous or short

5  because she didn't want you close to her?

6    A.    No, sir.

7    Q.    Well, we need to go to that, and that

8  is, did you ever put your hands on her during her

9  time of employment from January 5th until she was

10  terminated?

11    A.    Did I touch her on the shoulder while --

12  yes, sir, I sure did.

13    Q.    Okay.  Now, when you say you touched her

14  on the shoulder, did you ever give her what

15  somebody might interpret to be a back rub?

16    A.    No, sir.

17    Q.    Or a shoulder rub?

18    A.    No, sir.  I might have patted her on the

19  shoulder.  I might have -- that's not unusual for

20  me to do anyone that way.

21    Q.    Your characterizing it as a one handed

22  --

23    A.    Yes, sir.

1    A.    I couldn't answer that for you.  That

2  would be off -- you'd have to be right now making

3  notes to remember all of that.

4    Q.    Well, I understand.

5    A.    There is a very, very good chance that

6  I'd put both hands on their back.

7    Q.    Female employees?

8    A.    Female, male.

9    Q.    Okay.  And did you ever put your hands

10  in such a way that part of your hands were on the

11  front part of a person's body --

12    A.    No, sir.

13    Q.    -- as they were on the shoulder?

14    A.    No, sir.

15    Q.    Okay.  Did you ever put your hand on

16  anybody's neck?

17    A.    I could have touched their neck, yes,

18  sir.  I don't --

19    Q.    Well, if you're patting somebody on the

20  shoulder --

21    A.    It could hit their neck instead of their

22  shoulder.

23    Q.    Well, could you ever put your hand

1      A.   I talked to CC about the complaints I

2   had.  I didn't tell her it was her employees, one

3   or two of them that met with me, no, sir.

4      Q.   And you didn't document it in any way?

5      A.   No, sir.  And I didn't ask for the

6   meeting.  They did.  And when I went to the

7   meeting, I had no idea what the meeting was

8   about.  They just asked me if they could have a

9   meeting with me.

10      Q.   So in your initial discovery when your

11   attorney for you stated that you would provide

12   the policy manual maintained on the premises of

13   the store where plaintiff was manager, that would

14   only be a manual that was there possibly for the

15   last three or four weeks of her employment; is

16   that true?

17      A.   I believe it will be longer than that,

18   but a short time, yes, sir.

19      Q.   Okay.  Well, how much time passed after

20   the Florala meeting before the manual was placed

21   in the stores?

22      A.   After the Florala meeting before the

23   manual was placed in the store?

1       A.   And we -- until we had this meeting, we

2   used an employee handbook we got from another

3   store, the Skilstaff book, and from what we know

4   to be the law to make up this handbook.

5       Q.   But you didn't have a P&C Grocers

6   developed, written policy with regard to sexual

7   and religious harassment at all times during this

8   period, did you?

9       A.   No, sir.

10       Q.   And you say in there, in the planning

11   meeting statement of the case, that plaintiff did

12   not follow the written policy with regard to

13   sexual and religious harassment, and made no

14   complaints, and provided no notice to the persons

15   set forth in the written policy regarding sexual

16   and religious harassment.  Are you the person

17   that she's supposed to give notice to?

18       A.   She could have give it to Trot Carroll,

19   to Cindy.

20       Q.   What does the policy manual say?

21       A.   I'm not sure.

22       Q.   Okay.  So you don't even know what the

23   policy manual says?

1    intended to fire him?

2        A.    I don't remember.  I probably did, but I

3    don't remember.

4        Q.    And if she communicated that to him --

5        A.    I certainly told her that we wouldn't

6    tolerate a married employee dating another

7    married employee in that store.  I certainly told

8    her that.

9        Q.    Just not as graphically as she stated

10   you told her?

11       A.    No, sir.

12       Q.    That's your position?

13       A.    That's my position.

14       Q.    Okay.  Did you ever find any other

15   evidence of drinking, other than the smell of

16   alcohol, on the job site?

17       A.    No, sir.

18       Q.    How long have you lived in the south

19   Montgomery area?

20       A.    This time, about five years, I believe.

21   Something like that.

22       Q.    And where did you live before that?

23       A.    I moved back here from Little Rock --

1  did you recommend that she go to church?

2      A.   CC had -- I had been talking about her

3  drinking.  And she wanted to know what can I do,

4  I need some help.  I said go to your preacher and

5  those people know some people that's in that

6  business of helping folks.  I don't go to church.

7  I said, Well, then why don't you try going to

8  church and talk to that preacher.  Maybe he can

9  help you.

10      Q.   Okay.

11      A.   Yes, sir, I did that.

12      Q.   And did you do that just one time or

13  multiple times?

14      A.   No, sir, one time.

15      Q.   One time.  You never discussed religion

16  with her in any way other than that one time?

17      A.   I don't say that I didn't ever bring

18  religion up, but not in no way suggesting that

19  anything about her religion, no, sir.

20      Q.   And was anybody present when that

21  happened?

22      A.   Not to my knowledge, no, sir.

23      Q.   And did you take any of your actions

1    didn't find them.  But, yes, we had some shortage

2    problems, which is not unusual for any store from

3    time to time to have a cash shortage problem.

4        Q.    There is shoplifting and sometimes

5    people mismaking change.  That kind of thing

6    happens, doesn't it?

7        A.    It just happens, yes, sir.

8        Q.    But there wasn't any patterns or --

9        A.    No, sir.

10       Q.    -- anything that you noted relating to

11   CC?

12       A.    No.

13       Q.    And where do you attend church?

14       A.    Hills Chapel United Methodist Church in

15   south Montgomery County.  It's a country church.

16       Q.    I'm a Methodist, too.  And did you ever

17   recommend a specific church to CC or a specific

18   branch of religion to CC?

19       A.    No, sir.

20       Q.    And your testimony is that you took no

21   negative action relating to her acceptance or

22   lack of acceptance --

23       A.    No, sir.

STATE OF ALABAMA,

GENEVA COUNTY.

I, Lisa M. Bryan, Court Reporter and Notary Public, State at Large, do hereby certify that the foregoing transcript, pages 1 through 74 is a true and correct transcript of the testimony, to the best of my ability and understanding; and that the same was taken down by me in stenographic shorthand, recorded electronically, and transcribed by me personally or under my direct supervision.

I further certify that I have no interest in this matter, financial or otherwise, or how it may develop or what its outcome may be. I further certify that I am not of counsel for any of the parties, nor am I related to counsel or litigants or associated with anyone connected with this cause to my knowledge.

WITNESS my hand this the 20th day of March, 2006.

Lisa M. Bryan
My Commission Expires 12/09/09