**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CECELIA GIBBS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:05-cv-912-MHT |
| | ) | |
| P & C GROCERS, INC., AND | ) | |
| CHARLES PARKER, INDIVIDUALLY | ) | |
| AND AS AN AGENT FOR | ) | |
| P & C GROCERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' TRIAL BRIEF

NOW COME Defendants P&C Grocers, Inc. (hereinafter "P&C") and Charles Parker (hereinafter "Parker") and respectfully submit their Trial Brief pursuant to the Court's Pretrial Order.

## STATEMENT OF FACTS

Plaintiff, Cecelia Gibbs (hereinafter "Gibbs"), was an employee of P&C, working at its convenience store located in Eunola, Alabama. (Complaint, attached hereto as "Exhibit A," p. 2 ¶6). Gibbs had been employed at this particular convenience store on and off for approximately four years through various owners. (Doc. #13, Attachment #1, pp. 17-24). During this period, prior to being employed by P&C, Gibbs was eventually promoted from clerk to manager. (Doc. #13, Attachment #1, p. 10). In January 2004, P&C was formed and, shortly thereafter, the store at which Gibbs was employed was lease-purchased by P&C. (Parker Depo, attached hereto as Doc. #13, Attachment #2, p. 12). Defendant Parker is President and a 34% shareholder of the corporation. (Doc. #13, Attachment #2, pp. 9-12). John Trotman Carroll (hereinafter "Carroll") is also an owner and 33%

shareholder. (Doc. #13, Attachment #2, p. 11). Carroll had been involved in management of the store when it was owned by P&C's predecessor and had been the district manager over the stores acquired by P&C. (Doc. #13, Attachment #2, p. 11; Doc. #13, Attachment #1, pp. 17, 18, 50). After P&C acquired this and other stores, Parker acted as the district manager over some of the stores including the store at which Gibbs was employed and would come to the store once or twice a week to check on the store. (Doc. #13, Attachment #1, p. 48). Carroll and Cindy Woolover, who was also a district manager, would occasionally come to the store to check on things as well. (Doc. #13, Attachment #1, p. 50).

## I.    SEXUAL HARASSMENT

### A.    TOUCHINGS

Plaintiff alleges Defendant Parker "subjected her to unwanted, inappropriate, and harassing remarks and touching," specifically that Parker rubbed her shoulders every time he came into the store, beginning with his first visit. (Exhibit "A," p. 2 ¶9, Doc. #13, Attachment #1, p. 65). Plaintiff contends she requested that Parker desist what she terms sexual harassment yet no action was taken. (Exhibit "A," p. 2 ¶10). Parker has denied these allegations, for although he concedes that he may have patted the Plaintiff on the back or shoulder while talking to her, he never moved his hand around or touched her in any way that could be interpreted as rubbing or intended to be sexual. (Doc. #13, Attachment #2, p. 38).

We expect the Plaintiff to testify to an incident wherein Parker grabbed her by the shoulders and made her sit down. (Doc. #13, Attachment #1, pp. 75, 77). However, both parties agree that this isolated incident occurred when Parker was trying to get to the bottom of a situation wherein one of the employees at the store came up $60.00 short in his register. (Doc. #13, Attachment #1, p. 35).

Furthermore, Plaintiff has admitted in her deposition testimony that this encounter was not sexual because Parker was actually accusing either Gibbs or the other employee of stealing money from the store. (Doc. #13, Attachment #1, p. 77).

According to Gibbs, sometime shortly after a managers' meeting in July 2004, Parker came into the store and again rubbed her shoulders. (Doc. #13, Attachment #1, pp. 81-2). She testified that, on this occasion, she got ugly with him and told him to quit and either she or Parker walked away. (Doc. #13, Attachment #1, pp. 81-2). Gibbs also stated that Parker did not react to her comment nor did he resume touching her again. (Doc. #13, Attachment #1, p. 82). She can think of no time after this particular incident where Parker came into the store and touched her inappropriately. (Doc. #13, Attachment #1, p. 83).

### B.    REMARK (one)

Sometime in January or February 2004, Parker learned that a married, male employee, Jason Crosby, was having an affair with another married employee, April Davis, whose husband had filed for divorce and subpoenaed Gibbs to testify.[1] (Doc. #13, Attachment #1, pp. 92-96). Parker did not learn about this relationship until Gibbs was subpoenaed. (Doc. #13, Attachment #1, p. 96). Upon learning thereof, Parker was not happy about the relationship between these co-employees and advised Gibbs that he would not tolerate that behavior at the store; Parker also told Gibbs that Jason Crosby was no longer allowed to work at the store. (Doc. #13, Attachment #1, p. 93). We expect Parker to testify that he was concerned for the safety of his employees and customers when Gibbs

---

[1] Defendants expect both Jason and April Davis Crosby to testify to observing Parker sexually harass Gibbs. However, there is no evidence to suggest that either of these former employees of P&C ever reported their concerns to anyone at any time prior to their affidavits procured during the course of this litigation.

3

advised that when either Jason Crosby or April Davis were working, the other would come into the store to visit. In response thereto, Parker told Gibbs, "the next thing we'll have is a jealous husband or a jealous wife shoot somebody in the store." (Exhibit "B," p. 33). Parker came to the store to discuss the situation with Jason Crosby but Crosby was not at the store. (Doc. #13, Attachment #1, p. 94). Gibbs advised Parker that Crosby resigned and relinquished his store keys when she told him he was going to be terminated. (Doc. #13, Attachment #1, pp. 94-5). In response, Gibbs claims that Parker said to her "you don't get your pussy where you get your paycheck." (Doc. #13, Attachment #1, p. 89). Parker denies making that statement, but does admit that he said, "You don't dip your pen in company ink." (Doc. #13, Attachment #2, p. 35). The remark attributed to Parker by Gibbs is the only harassing remark Gibbs contends that Parker made. (Doc. #13, Attachment #1, p. 96). Gibbs did not respond to this comment nor do or say anything to indicate to Parker that she was offended by this comment or that she felt it was inappropriate. (Doc. #13, Attachment #1, p. 95).

## II.    **RELIGIOUS DISCRIMINATION**

Plaintiff's Complaint also alleges Defendant Parker "continually instructed the Plaintiff to 'get right with God.'" (Exhibit "A," p. 2 ¶11). She further asserts that she requested Parker refrain from "discussing religion in her presence" yet he refused. (Id.). However, Gibbs has conceded that these statements were often accompanied with Parker expressing his concern about her excessive drinking. (Doc. #13, Attachment #1, p. 109). According to Parker, he and Gibbs had been discussing her drinking when Gibbs asked for help which prompted Parker to advise that she go to her preacher "because they are in the business of helping people." (Doc. #13, Attachment #2, p. 65). Gibbs told Parker that she did not go to church and she did not have a preacher to go to see. (Doc. #13, Attachment #2, p. 65). Parker suggested she should try going to some church and talk to a

4

preacher; Parker did not specify a particular church, religion or preacher.  (Doc. #13, Attachment #2, p. 65).  Furthermore, Gibbs has admitted that she does, in fact, believe in God, she simply does not attend church.  (Exhibit "C," p. 103).  Gibbs further admitted that she never discussed her religious beliefs with Parker.  (Exhibit "C," p. 104).  Finally, Gibbs admits that Parker did not tell her that she would be terminated if she did not attend church.  (Doc. #13, Attachment #1, p. 106).

### III.  <u>P&C GROCERS' POLICY</u>

In or about April/May 2004, there was a managers' meeting held in Florala, Alabama, which was attended by Gibbs.  (Doc. #13, Attachment #1, p. 54).   Present at the meeting were the owners of the company, the district managers and the all of the store managers, including Gibbs.  (Doc. #13, Attachment #1, p. 51).  During the meeting, the P&C's Employee Handbook was read aloud and a copy was disseminated to all managers to be kept on their store premises.  (Doc. #13, Attachment #1, p. 58).  Upon returning from the meeting, Gibbs held an employee meeting  during which she went over the handbook with all of the employees.  (Doc. #13, Attachment #1, p. 59).  Gibbs admitted that there was a section of the handbook that specifically addressed sexual harassment. (Doc. #13, Attachment #1, p. 60).  It was Gibbs' understanding that every employee was to read the handbook and sign an acknowledgment form attesting that they have read the handbook.  (Doc. #13, Attachment #1, p. 61).  Gibbs also admitted that there was a sexual harassment/discrimination poster displayed on the wall near the bathroom at the store throughout the four years she worked at that location.  (Doc. #13, Attachment #1, p. 45).

### IV.  <u>REASON FOR TERMINATION</u>

Although Gibbs denies ever drinking alcohol at the store, she admits she has called from home when intoxicated to speak to employees working at the store.  (Doc. #13, Attachment #1, pp.

110-111). Parker further claims that there were multiple occasions where Gibbs called him at home at night and he could ascertain from her slurred words that she was intoxicated. (Doc. #13, Attachment #2, pp. 17, 18). Parker also stated that there were several mornings when he would arrive at the store early, before the store opened to be there when Gibbs arrived, and could smell a strong odor of alcohol on Gibbs' breath. (Doc. #13, Attachment #2, p. 18). Gibbs admits that she called the store daily and spoke with Cindy Garrett (hereinafter "Garrett"), a store clerk, while Garrett was working and sometimes it was after Gibbs had been drinking alcohol. (Doc. #13, Attachment #1, pp. 115, 127-8). We expect Garrett to testify to Gibbs' alcohol problem and how Gibbs' excessive drinking caused problems for the store and the store employees. (Doc. #13, Attachment #3). Gibbs called Garrett daily at work while drinking and would keep Garrett on the phone for extended periods of time discussing her personal life and problems she (Gibbs) was having. Id. Additionally, we expect Garrett to testify that she quit her job at the convenience store because "no job or paycheck is worth all the drunken phone calls I had to endure." Id. Eventually, Garrett returned to work at the convenience store but the drunken phone calls from Gibbs continued. Garrett contacted Parker to advise of the problems in the store and of Gibbs' behavior. Id. Gibbs also admits she has called district manager, Cindy Woolover (hereinafter "Woolover"), at night, at home after Gibbs had been drinking. (Doc. #13, Attachment #1, pp. 116, 140).

At some point just prior to Gibb's termination, two employees of the store requested a meeting with Parker. (Doc. #13, Attachment #2, p. 42). Parker did not know the purpose of the meeting until his arrival; however, he noted there was a store customer in attendance in addition to the two employees. (Doc. #13, Attachment #2, pp. 42-3). Jody Priddy, Dora Harmon and Rhonda Sheppherd told Parker about problems Gibbs was causing with the co-employees and with customers

due to Gibbs' erratic conduct and that they smelled alcohol on her when she was in the store working.  (Doc. #13, Attachment #2, p. 72).  We expect Mrs. Dora Harmon to testify that she advised Parker of several instances that she witnessed Gibbs curse in the presence of customers, take products off the shelf and not pay for them or take money out of the cash register to purchase lunch for herself and Gibbs' husband.  (Doc. #13, Attachment #3).  We further expect Mrs. Harmon to testify that Gibbs often called the store obviously intoxicated with no apparent reason for calling and that Gibbs' constant calls prevented the other employees from doing their jobs.  Id.  Thereafter, Parker talked to Gibbs about the complaints he had received from the co-workers and customer. (Doc. #13, Attachment #2, p. 44).

Shortly thereafter, Gibbs learned that someone had been hired to replace her and called Parker at his home to confront him.  (Doc. #13, Attachment #1, p. 84).  Parker told Gibbs they would discuss the matter the following day.  (Doc. #13, Attachment #1, p. 84).  The following day, Gibbs went to work, then left the store within forty-five minutes because she was upset that she was going to be fired.  (Doc. #13, Attachment #1, p. 87).  Gibbs called another employee into the store to cover her shift and went home.  (Doc. #13, Attachment #1 p. 87).  Gibbs testified that Parker called her at home from the store: "He basically told me that I needed to get my life right with God.  I needed to quit drinking.  And when I did those things, to call him back and he may put me back to work, but for now he was letting me go."  (Doc. #13, Attachment #1, p. 88).  Gibbs was fired by Parker over the telephone.  (Doc. #13, Attachment #1, p. 84).  Parker claims his reason for firing Gibbs was based upon:

> Her drinking problems, calling me at night, 9:00, 10:00, 11:00 at
> night.  Sometimes I'd be asleep and my wife would talk to her.  If I
> was at the store real early in the morning, you could smell alcohol on

> CC's breath bad a lot of mornings. I didn't say every morning. I said
> a lot of mornings. And that's why I talked to her about her drinking
> problem, because if it could be smelled on her in the store, then it
> was a problem to me.

(Doc. #13, Attachment #2, pp. 17-18). Parker further stated that his partner, Carroll, had told Parker that Gibbs called him while intoxicated and he had told Gibbs not to call him anymore when she had been drinking. (Doc. #13, Attachment #2, p. 31). Carroll also told Parker that if he did not fire Gibbs that he (Carroll) would fire her. (Doc. #13, Attachment #2, p. 31). Gibbs was terminated in June 2004. (Doc. #13, Attachment #1, p.28).

## V.    LACK OF NOTICE OF ALLEGED HARASSMENT/DISCRIMINATION

Gibbs has admitted that she did not report any of the incidents made the basis of her claims to anyone. (Doc. #13, Attachment #1, p. 97). She did not tell Woolover, whom she believes to be in upper management at P&C and has known for years that she felt Parker was harassing her. (Doc. #13, Attachment #1, pp. 97,99). Nor did she tell Carroll despite admitting she was aware that Carroll had an ownership interest in P&C and she knew him by name for years as he had previously been her district manager. (Doc. #13, Attachment #1, pp. 98-9). We expect the evidence to show that Gibbs called both Woolover and Carroll on previous occasions at their homes after she had been drinking. Yet, she never once alerted either of these managers to the fact that she felt Parker's behavior was inappropriate. Gibbs did not report any of the alleged instances of Parker's inappropriate conduct or remarks to anyone. (Doc. #13, Attachment #1, pp. 97-102).

After her termination, Gibbs filed a claim with the Equal Employment Commission based upon allegations of sexual and religious harassment. An investigation was conducted and Parker responded to the charge and submitted several sworn affidavits. ((Doc. #13, Attachment #4). The

EEOC issued a Dismissal and Notice of Rights letter which indicated "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." This finding was issued on June 28, 2005. ((Doc. #13, Attachment #5).

## ARGUMENT AND CITATION OF AUTHORITY

I.    **GIBBS CONCEDED AT THE PRETRIAL CONFERENCE THAT PARKER IS NOT LIABLE FOR PLAINTIFF'S CLAIMS UNDER TITLE VII AS THERE CAN BE NO TITLE VII CAUSE OF ACTION AGAINST AN INDIVIDUAL.**

"Title VII of the Civil Rights Act makes it an 'unlawful employment practice' for an **_employer_** to 'fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.'" *Cotton v. Cracker Barrell Old Country Store, Inc*., 434 F.3d 1227 (11th Cir. 2006), citing 42 U.S.C. § 2000e-2(a)(1). "[H]owever, it is well established in this circuit that a Title VII action will not lie against an individual employee." *Rossi v. Troy State* University, 330 F.Supp.2d 1240, 1244. *See Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir. 1991)("individual capacity suits under Title VII are...inappropriate."); *Cross v. State of Alabama Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1504 (11th Cir.1995). The *Rossi* court further established that a suit against an individual acting in his official capacity is a suit against the entity which the individual represents. *Id*. And a claim for damages against an individual acting in his official capacity is a claim against the entity. *Id.*

The introduction to Plaintiff's claim establishes that she brings this suit pursuant to Title VII, 42 U.S.C. § 2000e-2(a)(1). Each of the three counts of Plaintiff's Complaint are based upon Title

VII.  It has been clearly established that there is no cause of action against an individual under Title VII.  Furthermore, it has been established that a suit against an individual acting in his official capacity is a suit against the entity which that individual represents.  Plaintiff's claims against Defendant Parker in his official capacity are subsumed by her claims against the entity which he represents, P&C, and there is no basis whatsoever for any liability of Defendant Parker, under the allegations made in Plaintiff's Complaint.

## II.    NEITHER P&C NOR PARKER IS LIABLE FOR PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS.

Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a *prima facie* case of unlawful discrimination by a preponderance of the evidence.  *Pate v. West Publishing Corp.,* 2006 WL 463543 (M.D. Ala), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 2000).  "If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action." *Id.*, citing *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir.  2000).  "The defendant has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced."  *Id.*, *see, e.g., Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-258, 101 S.Ct. 1980, 67 L.Ed.2d 207 (1981).  Defendant need only produce, not prove, the nondiscriminatory reasons, the burden is "exceedingly light."  See *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th  Cir. 1983); See also *Turner v. Amsouth Bank, N.A.,* 36 F.3d 1057, 1061) (11th Cir. 1994).  "Once the defendant satisfies this burden of production, 'the presumption of discrimination is eliminated and the plaintiff has the opportunity

to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the real reasons for the adverse employment decision.'" *Id.*, citing *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). "The plaintiff may meet this burden by persuading the court that a discriminatory reason more than likely motivated the defendant or by demonstrating that the proffered reason for the employment decision is not worthy of belief." *Id.,* citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-258, 101 S.Ct. 1980, 67 L.Ed.2d 207 (1981). If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered nondiscriminatory reasons, summary judgment should be granted. *Holifield v.Reno,* 115 F.3d 1555, 1565-66 (11th Cir. 1997).

Plaintiff has made bare allegations that her termination was based upon sexual or religious discrimination; however, Defendants shall produce overwhelming evidence at the trial of this matter that the basis for Plaintiff's termination was her drinking problem, a fact which Plaintiff half-heartedly denies. By Plaintiff's own admission, she was advised by Parker, prior to her termination, that her excessive drinking was not acceptable and was having an adverse effect on her work. As such, Plaintiff cannot establish that Parker's stated reason for her termination, *i.e.*, the disruptive behavior resultant from her excessive drinking, is not the legitimate reason for Parker's determination to fire her.

In order for a plaintiff to establish a claim under any Title VII theory of discrimination, including religion, the plaintiff must establish:

> (1) that he or she belongs to a protected group;
> (2) that the employee has been subject to unwelcome harassment;
> (3) that the harassment was based on the religion of the employee;

11

(4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment; and
(5) a basis for holding the employer liable.

*Rossi v. Troy State University*, 330 F. Supp.2d 1240, 1245 (M.D.Ala.2002) citing *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 582 (11th Cir.2000)(in the sexual harassment context); *see also, Hafford v. Seidner*, 183 F.3d 506, at 512 (applying standard to religious discrimination claim). "Factors which can be considered are the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." *Id.,* citing *Rojas v. Florida,* 285 F.3d 1339, 1334 (11th Cir. 2002).

In this case, the analysis need not go beyond the initial prong as Plaintiff has failed to establish that she is a member of *any* protected group. By Plaintiff's own admission, she does believe in God. She also has stated that she has never discussed her religious beliefs with Parker. Because Plaintiff has failed to establish that her religious beliefs place her into any protected group and by her own admission, both she and Parker actually shared a belief in God, the initial element necessary to establish her claim of religious discrimination, *i.e.*, membership in a protected group is lacking and Plaintiff's claim is without merit.

A.    **Plaintiff Was Clearly Not Subjected To A Religiously Hostile Work Environment And Defendant Had Wholly Independent Reasons For Her Termination.**

Whether Plaintiff's work environment can be considered religiously hostile for purposes of Title VII requires the Court's assessment of the totality of the circumstances, wherein the Court should consider the frequency of the discriminatory conduct, its severity, whether it is physically

threatening or humiliating or mere offensive utterances, and whether it unreasonably interfered with plaintiff's work performance. *Tillery v. ATSI, Inc.,* 242 So.2d 1051 (N.D. Ala. 2003). The courts have established where the Plaintiff alleges she was fired because she did not share the religious beliefs of her employer, she "need only show that her perceived religious shortcomings played a motivating role in her discharge. *Id.* (citations omitted). The *Tillery* court adopted the elements enumerated by the 10th Circuit for establishing a *prima facie* case:

> (1) that [s]he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the **employee's job performance was satisfactory**; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

*Id.* at 1061, citing *Los Alamos National Laboratory*, 992 F.2d 1033, 1038 (10th Cir. 1993).

"As in any other discriminatory discharge case, plaintiff can establish that she was discharged on the basis of her religion, or lack thereof, with either direct or circumstantial evidence." *Id.* at 1058. The standard for proving discriminatory intent by direct evidence is a stringent one, however, and ***only the most blatant comments will suffice***. *Id.,* citing *Earley v. Champion International Corp.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990) (emphasis added). "The most obvious and compelling example of such evidence in the context of a case in which the plaintiff contends that she was discharged on the basis of her religion 'would be a remark to the effect that...I'm firing you because you're not a Christian.'" *Id.*, citing *Venters v. City of Delphi,* 123 F.3d 956, 972-73 (7th Cir. 1997). Here, Plaintiff has disclaimed any such direct evidence, "He didn't say he was going to terminate me for them reasons, no." (Exhibit "A," p. 106). Therefore, the analysis must turn to whether she can establish her claim by circumstantial evidence.

13

"In the absence of direct evidence, plaintiff must rely upon circumstantial evidence and navigate the burden-shifting analysis first promulgated in *McDonnell.*" *Tillery* at 1059, *McDonnell Douglas Corp., supra*. However, it is important to note that in establishing pretext in Title VII religious discrimination action, Plaintiff is not allowed to recast employer's proffered non-religious based reasons for adverse action or substitute her business judgments for that of her employer. *Id.*

In the case *sub judice*, Plaintiff contends that she was fired because she did not share Defendant Parker's religious beliefs and did not attend church. However, Plaintiff admits that she and Parker did not have any discussions about her religious beliefs. She further admits that she did in fact share Parker's religious beliefs in the sense that she too believes in God. Plaintiff claims, "he told me I needed to start going to church." (Doc. #13, Attachment #1, p. 107). However, she also admits that Parker did not tell her which church to attend, only that he made general statements to her that she needed to "get her life right with God." (Doc. #13, Attachment #1, p. 107). "He never told me he was going to terminate me." (Doc. #13, Attachment #1, p. 107). Plaintiff cites no direct evidence that Parker terminated her because she did not adhere to his religious beliefs. Therefore, we must look to the additional evidence presented to ascertain whether Plaintiff is able to make a *prima facie* case of discrimination.

It is undisputed that Plaintiff has suffered an adverse employment action by being terminated, thereby fulfilling element (1). However, Plaintiff cannot complete the requisite analysis as she is unable to establish that she was performing her job satisfactorily at the time of termination. It is undisputed that Plaintiff was well aware of the fact that her excessive drinking was causing her employer a great deal of concern and admits that he discussed the fact that her drinking was affecting her work on multiple occasions. (Doc. #13, Attachment #1, p. 107). Plaintiff also admits that it was

14

only in the context of expressing his concern about her excessive drinking that Parker spoke to her about religion or encouraged her to go to church or "get her life right with God."  Plaintiff does not dispute Parker's testimony regarding the fact that she oftentimes called another store clerk, Garrett, as well as another store manager, Woolover, when she was under the influence of alcohol.  Clearly, Plaintiff's job performance was unsatisfactory if a store customer felt it necessary to advise the store owner of her behavior and attitude. The mere fact that Parker encouraged her to seek counseling with a preacher or attend church will not establish her claim for religious discrimination especially in light of the fact that Plaintiff admits that she was made aware by Parker well in advance of her termination to change her ways.

"The court is not in the business of adjudging whether employment decisions are prudent or fair.  Instead, the court's sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  *Pate v.  West Publishing Corp.,* 2006 WL 463543 (M.D. Ala), citing *Damon v.  Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999). Plaintiff cannot establish that Defendant Parker's basis for her termination is pretext because she freely admits that she did call at least one employee and one manager while she was under the influence of alcohol and admits she was made aware that her drinking was the cause of great concern for her employer.  By Plaintiff's own admission, she was aware that her job performance was unsatisfactory and, as such, cannot establish a *prima facie* case of religious discrimination based upon her unsatisfactory job performance.

Finally, Plaintiff cannot establish the final prong of the *Tillery* analysis as she cannot establish that she suffered any adverse action as a result of her religious beliefs differing from Parker's. Rather, by Plaintiff's own admission, she has established just the contrary.  Plaintiff

15

testified that she, like Parker, believes in God. She has further stated that she did not discuss her religious beliefs with Parker. She and Parker share their religious belief in God and, as such, Plaintiff cannot establish that she was subjected to discriminatory animus for failure to adhere to Parker's religious beliefs as required by the third prong of the *Tillery* analysis.

### B. Neither Defendant Is Liable For Plaintiff's Claim Of Sexual Discrimination

To establish a *prima facie* case of sexual discrimination, it is necessary that Gibbs prove that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003).

Although it is undisputed that Plaintiff suffered an adverse employment action, in that she was terminated, it is disputed that Plaintiff's bare allegations of harassment were in any way related to said termination. We expect the evidence to show that Plaintiff was terminated solely based upon her poor job performance and the disruption caused by her intoxicated phone calls. Additionally, evidence will show the decision to terminate Plaintiff was not made solely by Parker but rather by Carroll as well. Significantly, by Plaintiff's own admission, she never told anyone, including Carroll, that she was being subjected to any form of harassment by Parker. Therefore, Carroll's instruction to Parker to terminate Gibbs cannot form the basis of a retaliatory discharge claim.

Additionally, Plaintiff's claim of sexual discrimination fails as a matter of law due to the fact that she cannot establish element (4) because she was replaced by someone *within* her protected group, *i.e.*, a female. Plaintiff is a white female and was replaced by another white female. Plaintiff can offer no evidence to suggest that she was replaced by a similarly situated employee who is

outside of her protected class, nor can she present any evidence that she was treated less favorably than another similarly situated employee. Plaintiff has named no other employee who engaged in the manner of disruptive intoxicated behavior in which she was engaged. If anything, Plaintiff was given ample opportunity to remedy the situation prior to her termination. Plaintiff does not deny that Parker made her aware of his concerns on multiple occasions. She also admits that when she and Parker discussed her termination, he advised her that he would consider rehiring her if she got her life together and quit drinking. (Doc. #13, Attachment #1, p. 88). There is nothing to support Plaintiff's allegations and, as such, neither Parker nor P&C can be liable for Plaintiff's claim of sexual discrimination.

### C.    Neither Defendant Is Liable For Plaintiff's Claim For Sexual Harassment

In order to establish a claim for sexual harassment under Title VII, the Supreme Court has determined that the plaintiff may rely on one of two theories, either that the harassment culminated in a tangible employment action against her or that the severe or pervasive conduct created a hostile work environment. *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006). As established by the Supreme Court, "tangible employment action" as established by Title VII of the Civil Rights Act is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing significant change in benefits -- action that results in direct economic harm. *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006). "There must also be a causal link between the tangible employment action and the sexual harassment." *Cotton v. Cracker Barrell Old Country Store*, 434 F.3d 1227 (11th Cir. 2006), citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001). However, any intervening acts may disrupt and thereby undermine the

17

causal link between the harassment and tangible employment action.   *Taylor v. CSX Transportation*, 2006 WL 544519 (M.D. Ala.), citing *Gleason v. Mesirow Fin, Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997).

      **1.     Plaintiff cannot establish a claim for sexual harassment under the tangible employment action theory.**

      The *McDonnell Douglas* burden-shifting analysis requires the defendant to proffer a non-discriminatory reason for the adverse employment action.  Plaintiff then has the heavy burden of establishing that the reason offered is mere pretext.  However, in the instant matter, it is wholly unnecessary to look beyond the initial production to determine whether Plaintiff must attempt to establish a *prima facie* case of sexual harassment as Plaintiff cannot produce sufficient evidence to prove that the reasons proffered by the Defendant for terminating Plaintiff's employment are anything but legitimate.

      Parker has testified that Plaintiff was terminated because her excessive drinking was having a direct impact on her job performance.  He further testified that he was alerted to Plaintiff's disruptive nature in an impromptu meeting called by two of her fellow employees and a store customer.  Additionally, Parker has firsthand knowledge that Plaintiff's drinking was causing a disturbance as he testified that Plaintiff called him at his home, at night, several times when she was obviously under the influence of alcohol as evidenced by her slurred words and rambling conversation.  It is undisputed that Carroll threatened to fire Plaintiff if Parker did not because he too had enough of Plaintiff's late night, drunk phone calls to his home.  The impact Plaintiff's alcohol abuse was having on the store will not only be supported by the testimony of Parker, but also by the anticipated testimony of Cindy Garrett, Dora Harmon, and Cindy Woolover among others.

Plaintiff has not attempted to dispute Parker's proffered reason for her termination. She admitted that Parker expressed his concerns about her drinking to her on multiple occasions. She admitted that he told her that the excessive drinking was affecting her work. She admitted that she called another store clerk daily when that clerk was working and Plaintiff was at home. She admitted that these conversations were sometimes lengthy and that sometimes she would initiate these conversations after she had consumed alcohol. She further admitted that she called district manager Cindy Woolover at home from time to time and that there were times when she and Woolover spoke on the phone while Plaintiff was intoxicated. It is undisputed that Plaintiff was put on notice that her drinking was causing great concern among management, yet she chose to ignore Parker's expressions of concern. Plaintiff has not offered a scintilla of evidence to rebut the fact that Defendant's decision to terminate her was based upon anything unlawful and, as such, neither Defendant is liable to her.

### 2. Plaintiff cannot establish a claim for sexual harassment under the hostile work environment theory.

A Title VII hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct.367, 126 L.Ed.2d 295 (1993), quoting *Meritor Savings Bank, FSB v. Vinton,* 477 U.S. 57, 65, 67, 106 S.Ct.2399, 91 L.Ed.2d 49 (1986). In order to establish a hostile work environment based upon sexual harassment, in violation of Title VII, Gibbs must prove that (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual

19

nature; (3) harassment was based upon her sex; (4) harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding her employer liable. *Jackson v. Cintas Corp.,* 391 F.Supp.2d 1075, 1087 (M.D. Ala.2005), citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999).

The foregoing analysis requires the Court to consider Plaintiff's claims both subjectively and objectively. "The subjective component focuses on the employee's perception. The employee must perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* "Factors which can be considered are the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." *Rossi v. Troy State University*, 330 F.Supp.2d 1240, 1245 (M.D. Ala. 2002), citing *Rojas v. Florida,* 285 F.3d 1339, 1344 (11th Cir. 2002).

Plaintiff premises her claim that she was subjected to a hostile working environment on the fact that Parker rubbed her shoulders and back when he visited the store and that he once subjected her to harassing remarks. However, neither of these allegations will suffice to establish that she was forced to endure a truly hostile environment.

     **(a)**    <u>TOUCHING</u>

Plaintiff claims that Parker massaged her neck and shoulders every time he visited the store. She further claims that she indicated to him that she did not feel comfortable with him touching her and that she felt such touching was inappropriate. She makes no claim that Parker ever made any requests for sexual favors or that the "inappropriate touching," as she terms it, was anything more

than back rubbing. She also admits that when she "got ugly" with Parker and assertively told him that she did not feel comfortable with him touching her back that he desisted and did not do so again. Of course, Parker denies ever touching Plaintiff inappropriately or that he ever rubbed her back. And although Plaintiff may have subjectively felt this behavior created a hostile environment, her perception is clearly unreasonable from an objective viewpoint. Plaintiff contends Parker rubbed her back, neck and shoulders. No reasonable person would interpret an occasional backrub or pat on the back as threatening or humiliating. Plaintiff made absolutely no complaints about any of Parker's alleged behavior towards her until well after she was fired and, even now, she does not contend that Parker's behavior caused her any degree of humiliation, intimidation or prevented her from adequately performing her job.

      **(b)**    <u>REMARK (one)</u>

Plaintiff also claims that Parker made one statement to her upon which she bases this assertion of a hostile work environment. Plaintiff claims that Parker made an inappropriate comment to her with respect to the fact that he was going to have to terminate an employee. She testified that Parker was upset about the fact that two of his employees were having an extra-marital affair with one another and visiting each other when either one was working at the store. Parker advised that he would not tolerate this behavior at the store and on company time. According to Plaintiff, when she advised Parker that the employee had resigned and turned his store keys in to her, he retorted with "you don't get your pussy where you get your paycheck." However, Plaintiff admits that she did not respond to this comment. She testified that she exhibited a shocked look on her face and that she said nothing. However, she admitted that this was an isolated incident and she can think of no other instances of unwanted harassing remarks. (Doc. #13, Attachment #1, p. 95).

Once again, there is nothing to indicate that this remark was in any way related to Plaintiff's sex, that it was physically threatening, humiliating, pervasive or severe. Plaintiff agrees, this was one isolated comment. And although Defendant Parker denies making this comment, even if this statement were made by Parker in the exact manner claimed by Plaintiff, it will not suffice to establish a hostile working environment. There is nothing to suggest this comment was in any way related to the fact that Plaintiff is a female; rather, it would suggest it was more of an outburst to his store manager. There is nothing to suggest that Plaintiff was humiliated. She admits that her only reaction to this comment was "shocked." This does not establish a hostile work environment. There are many things which may be shocking, but that does not render them sufficiently severe to alter the terms of her working environment.

Plaintiff points to two complaints upon which she bases her claim that she was subjected to a hostile work environment -- the unwanted touching and Parker's lone comment. Neither of these rise to the level of severity required to establish what a reasonable person would consider discriminatorily abusive. Plaintiff cannot establish that she was subjected to a hostile work environment or sexual harassment; accordingly, neither Defendant is liable.

**3.     P&C is Not Strictly Liable for the Alleged Sexual Harassment by Parker**

Gibbs argues in her RESPONSE TO DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT that the notice requirement is nullified by the fact that Parker is in management and seems to suggest to this Court that the holding in *Farragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), establishes P&C's strict liability for the actions of Parker. However, the *Farragher* opinion does not establish a blanket finding of strict liability of the employer for the actions a manager employee as the Plaintiff's brief seems to suggest.

Rather, in *Farragher,* the basis for finding strict liability for the City of Boca Raton is premised upon the specific facts of that case which incidentally are not analogous to the case *sub judice*.  In *Farragher*, the court determined: (1) "the harassment was pervasive enough to support an inference that the City had 'knowledge or constructive knowledge' of it"; (2) "a third supervisor had knowledge of the harassment and failed to report it to City officials"; (3) "these supervisors were granted virtually unchecked authority over their subordinates and that Faragher and her colleagues were completely isolated from the City's management"; (4) "the City had entirely failed to disseminate its sexual harassment policy among beach employees;" (5) "its officials made no attempt to keep track of the conduct of the supervisors", and (6) "the record makes clear that the City's policy did not include any harassing supervisors assurance that could be bypassed in registering complaints." *Id.* at 775 and 778.

There is nothing to suggest that the alleged sexual harassment by Parker was pervasive so as to impute knowledge thereof to the other two co-owners of the business.  Nor is there anything to indicate that anyone in management was ever alerted to the situation.  By Plaintiff's own admission,  she has never been "isolated" from others in management.  She was well aware of the identity of two other managers, and had no qualms about calling both Woolover and Carroll at home after hours.  Regardless, she never once alerted anyone to this purported "harassment" until her EEOC charge was filed subsequent to her termination.  Additionally, Plaintiff has admitted that she was present at a manager's meeting during which the P&C Handbook was disseminated.  She further admitted this handbook specifically addressed sexual harassment and that topic, as well as the company's reporting policy, were presented at the meeting.  Plaintiff also stated that she read the handbook in its entirety and was responsible for and did conduct training of the employees at the

23

store under her management with regard to the handbook and the sexual harassment policy. By Plaintiff's only testimony, she has established that the sexual harassment policy of P&C was, in fact, well disseminated and that she personally had ample opportunity to familiarize herself therewith.

As evidenced herein above, there is nothing about the facts of this case that is analogous to those of *Farragher* and nothing to suggest a finding of liability as a matter of law would be warranted herein. Contrary to Plaintiff's argument, the *Farragher* court did not establish that every employer shall be held in strict liability for the sexual harassment by its management; rather, the finding of strict liability in the matter of *Farragher* was premised on the specific facts of that case and the egregious violations noted above. There is no parallel to the case *sub judice* and, as such, there is no legal authority to hold P&C strictly liable for the actions of Parker.

### 4.    Punitive Damages are Inappropriate Against P&C for Parker's Alleged Sexual Harassment.

Although, pursuant to the holding in *Farragher,*  Parker's managerial position may suffice to establish vicarious liability on the part of P&C, it cannot and will not suffice to justify punitive damages.  In *Dudley v. Wal-Mart Stores, Inc.*, the 11th Circuit specifically declined to extend the decision in *Farragher* to allow vicarious liability for punitive damages.  The *Dudley* court stated,

> For punitive damages in this Circuit, the employer must be proved to be at fault... .  Given the requirement of notice or knowledge for punitive damages in this Circuit, however, we are doubtful that *Farragher*, which is *not* about punitive damages, can (or was intended to) overrule our pre-*Farragher*, punitive damages precedent.

*Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, FN8 at 1323 (11th Cir. 1999).

By Plaintiff's own admission, she never alerted anyone at P&C to the alleged harassment by Parker. P&C was never put on notice of Parker's behavior and, as such, punitive damages are inappropriate against P&C.

### III. PLAINTIFF CANNOT ESTABLISH A CLAIM FOR RETALIATION BECAUSE, BY HER OWN ADMISSION, SHE DID NOT ENGAGE IN ANY PROTECTED CONDUCT.

"Title VII prohibits an employer from retaliating against an employee for enforcing her rights under the act." *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 (M.D. Ala), citing *Cotton v. Cracker Barrell Old Country Store, Inc.,* 434 F.3d 1227, 1233 (11th Cir. 2006). "Title VII prohibits retaliatory action against an employee 'because he has opposed any practice made an unlawful employment practice by this [title]; or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].'" *Id.*, citing 42 USC § 2000e-3(a). "This provision has two components, an opposition clause and a participation clause." *Id.* The opposition clause requires a plaintiff to (1) oppose an employment practice and (2) have a good faith, reasonable belief that the practice opposed is unlawful. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). "To establish a *prima facie* case of retaliation,...a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; (3) the adverse action was causally related to the protected expression." *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 (M.D. Ala), citing *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir. 1998). Once plaintiff has established adequate evidence to create this inference, it is her responsibility to further demonstrate a causal connection between the statutorily protected speech and the employment action. *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 at 7 (M.D. Ala), citing *Shannon v.*

25

*Bellsouth Telecommunications Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). "This element is satisfied where the plaintiff provides 'sufficient evidence that the decision-maker became aware of this protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action.'" *Tolbert v. Follett Higher Education Group, Inc.*, 2006 WL 559462 at 7 (M.D. Ala), citing *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir. 1997).

Plaintiff has not engaged in any activity which would fall under the protection of this act. She did not oppose any unlawful employment practice nor did she participate in anything pertaining to an unlawful employment practice.[2]  By Plaintiff's own admission, she never informed anyone at P&C of the allegations upon which she bases this complaint.  Nonetheless, assuming *arguendo* that Plaintiff is alleging she was terminated because she told Parker, in an ugly tone, not to touch her, she cannot present sufficient evidence in support of this theory and the temporal proximity alone is far too tenuous to create an inference of retaliation.

Plaintiff alleges that the final incident wherein  she "got ugly" when she told Parker to stop touching her occurred  sometime after the manager's meeting, which was approximately one month prior to her termination.[3]   She claims she'd told Parker to stop touching her many times prior to this; however, on this one occasion, she got real ugly and she was blunt, "I told him, Mr. Parker, stop."   However, Plaintiff admits that Parker simply walked away and he stopped touching her.

---

[2] Although Plaintiff did file a claim with the Equal Employment Opportunity Commission, which would constitute protected speech, said claim was not filed until after she was terminated, which negates any possibility that her termination could be based thereupon.

[3] Plaintiff admits the procedure for reporting sexual harassment was discussed at this manager's meeting; however, she did not advise any of the other managers of her perceived harassment, per company policy, and has never indicated to anyone, prior to filing her EEOC complaint, that she felt she was being subjected to a hostile work environment.

When asked how Parker reacted to her statement, Plaintiff replied, "He didn't react... either he or [she] walked away." (Doc. #13, Attachment #1, p. 82). Plaintiff also admitted that she cannot recall another instance of Parker touching her after that day, which was several weeks prior to her termination. (Doc. #13, Attachment #1, p. 83). There is no causal connection between Plaintiff's purported resistance to Parker and her termination. This one singular incident which occurred a few weeks prior to her termination cannot establish an inference that her termination was based upon her telling Parker not to touch her, especially in light of the fact that Carroll, who knew absolutely nothing about Plaintiff's claims of alleged harassment, had stated to Parker that he intended to fire Plaintiff if Parker did not.

There is absolutely no evidence to suggest that either of the two other shareholders, anyone in any level of management or any co-employee for that matter, had any knowledge whatsoever about Plaintiff's claims. Plaintiff admits that she did not report Parker's alleged inappropriate touching to anyone. She claims that she did not know who she could report his behavior to and that she did not see where it would be worthwhile since he is an owner of the company. However, by her own testimony, this last "incident" occurred shortly after the manager's meeting during which the sexual harassment policy was discussed. During that meeting, P&C's Employee Handbook was reviewed and the attendees were not only advised of P&C's harassment and reporting policy, but also given a copy of the handbook to maintain at the store premises. Despite having had this policy explained to her, and having read and explained it to her own employees, Plaintiff told no one of this alleged harassment to which she was being subjected.

Plaintiff also admits that she has known Carroll and Woolover for years and evidence will show Gibbs had no qualms about calling Carroll or Woolover at home after she had been drinking.

27

Carroll is a co-owner of the company and formerly served as Plaintiff's district manager.  She further testified that she has called Woolover at home to discuss other issues about the store.  She admitted that she had discussed the situation wherein Jason and April Crosby were having an affair with Woolover.  She admitted that both Woolover (district manager) and Carroll (co-owner, district manager) both visited the store on occasion.  Despite knowing other managers personally, to the point where she could and would call them at home after hours, Plaintiff called no one.  Plaintiff did not complain about anything pertaining to her employment to anyone involved in P&C at any point.  It was not until well after her termination that she felt compelled to voice these allegations for the first time.

        Plaintiff engaged in no speech.  She alerted no one to the alleged harassment she was experiencing.  There can be no retaliation when there is nothing upon which to base it.  Plaintiff cannot establish anything which would entitle her to protection under Title VII for retaliatory discharge and, as such, Plaintiff's claims for sexual and religious retaliation are without merit.

        **RESPECTFULLY SUBMITTED,** this the 3rd day of January,  2007.


                                                                       /s/ Micheal S. Jackson
                                                                       **MICHEAL S. JACKSON [JACKM8173]**
                                                                       Attorney for Defendants Charles Parker and
                                                                       P&C Grocers, Inc.


**OF COUNSEL:**

BEERS, ANDERSON, JACKSON,
    PATTY, VAN HEEST & FAWAL, P.C.
P. O. Box 1988
Montgomery, AL 36102
(334) 834-5311
(334) 834-5362 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of January, 2007, I electronically filed DEFENDANTS' TRIAL BRIEF with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Blakeney, Esq.
P. O. Box 100
Geneva, AL 36340

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

/s/ Micheal S. Jackson                                      
**OF COUNSEL**